# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____  :
                                            :
SOUTHEASTERN PENNSYLVANIA                   :   No. 2:11-cv-01628-JHS
TRANSPORTATION AUTHORITY,                   :
individually and on behalf of all others similarly :   **ORAL ARGUMENT REQUESTED**
situated,                                   :
                                            :
                    Plaintiff,              :
                                            :
          v.                                :
                                            :
THE BANK OF NEW YORK MELLON                 :
CORPORATION, MELLON BANK N.A., THE          :
BANK OF NEW YORK MELLON,                    :
                                            :
                    Defendants.             :
_____  :


## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
## MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................................1

STATEMENT OF FACTS .........................................................................................3

ARGUMENT ........................................................................................................13

   I.  PLAINTIFF HAS FAILED TO STATE A CLAIM OF BREACH OF CONTRACT OR THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.....................15

      A.  Plaintiff Has Failed to Allege Facts Supporting a Plausible Inference that Defendants Breached the Express Terms of Their Contract.......................................15

      B.  Plaintiff Has Failed to Allege a Breach of the Implied Covenant of Good Faith and Fair Dealing.......................................................................................... 19

   II.  PLAINTIFF CANNOT ASSERT TORT OR QUASI-CONTRACTUAL CLAIMS WHERE A CONTRACT GOVERNS THE MATTER IN DISPUTE ............................21

      A.  Plaintiff's Breach of Fiduciary Duty Claim Is Barred Under Pennsylvania's "Gist of the Action" Doctrine .................................................................... 21

      B.  Plaintiff's Unjust Enrichment Claim Is Barred by Pennsylvania Law ...................... 23

   III. PLAINTIFF FAILS TO ALLEGE A BREACH OF FIDUCIARY DUTY CLAIM ........24

      A.  The Master Trust Agreement Did Not Create a Fiduciary Relationship with Respect to FX Services ............................................................................. 25

      B.  The Relationship Between BNY Mellon and SEPTA Did Not Create a Fiduciary Duty with Respect to FX Services............................................................ 26

      C.  Plaintiff's Breach of Fiduciary Duty Claim Is Inconsistent with the Written Agreements Between the Parties ................................................................. 30

   IV. PLAINTIFF'S CLAIMS ARE TIME-BARRED ............................................32

   V.  PLAINTIFF HAS FAILED TO STATE A CLAIM AGAINST DEFENDANT BNY MELLON CORP. ...................................................................................33

CONCLUSION.....................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Allstate Transp. Co., Inc.* v. *Se. Pa. Transp. Auth.*,
  No. Civ. A. 97-1482, 2000 WL 329015 (E.D. Pa. Mar. 27, 2000) .................................. 20

*Alpart* v. *Gen. Land Partners, Inc.*,
  574 F. Supp. 2d 491 (E.D. Pa. 2008) ....................................................................... 23, 24

*Am. Stores Props., Inc.* v. *Spotts, Stevens & McCoy, Inc.*,
  651 F. Supp. 2d 349 (E.D. Pa. 2009) .............................................................................. 23

*Anserphone, Inc.* v. *Bell Atlantic Corp.*,
  955 F. Supp. 418 (W.D. Pa. 1996) ................................................................................... 33

*Ariz. State Carpenters Pension Trust Fund* v. *Citibank (Ariz.)*,
  125 F.3d 715 (9th Cir. 1997) ........................................................................................... 30

*Ashcroft* v. *Iqbal*,
  129 S. Ct. 1937 (2009) ..................................................................................................... 14

*Bane* v. *City of Phila.*,
  Civ. A. No. 09-2798, 2009 WL 6614992 (E.D. Pa. June 18, 2009) ................................ 14

*Basile* v. *H & R Block, Inc.*,
  761 A.2d 1115 (Pa. 2000) ................................................................................................ 26

*Beddall* v. *State Street Bank & Trust Co.*
  137 F.3d 12 (1st Cir. 1998) .............................................................................................. 29

*Bell Atl. Corp.* v. *Twombly*,
  550 U.S. 544 (2007) ......................................................................................................... 14

*Bohler-Uddeholm Am., Inc.* v. *Ellwood Group, Inc.*,
  247 F.3d 79 (3d Cir. 2001) ............................................................................................... 22

*Bourke* v. *Kazaras*,
  746 A.2d 642 (Pa. Super. Ct. 2000) ................................................................................. 17

*Brown & Brown, Inc.* v. *Cola*,
  745 F. Supp. 2d 588 (E.D. Pa. 2010) ............................................................................... 22

*Buchanan* v. *Brentwood Fed. Sav. & Loan Ass'n*,
  320 A.2d 117 (Pa. 1974) .................................................................................................. 30

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997) ............................................................................................. 4

*Coldwell Banker Commercial/Feist* v. *BEF Corp.*,
No. 2007-C-1707, 2007 WL 5023233 (Pa. Commw. Ct. Dec. 26, 2007) ....................... 28

*Cole* v. *Lawrence*,
701 A.2d 987 (Pa. Super. Ct. 1997) .................................................................. 33

*Compania Sud-Americana de Vapores, S.A.* v. *IBJ Schroder Bank & Trust Co.*,
785 F. Supp. 411 (S.D.N.Y. 1992) ................................................................... 29

*Curley* v. *Allstate Ins. Co.*,
289 F. Supp. 2d 614 (E.D. Pa. 2003) ............................................................... 24

*Devon IT, Inc.* v. *IBM Corp.*,
Civ A. No. 10-2899, 2011 WL 1331888 (E.D. Pa. Mar. 31, 2011) ........................... 26, 28

*In re Enron Corp. Sec. Derivative & "ERISA" Litig.*,
540 F. Supp. 2d 759 (S.D. Tex. 2007) ............................................................. 10

*eToll, Inc.* v. *Elias/Savion Adver., Inc.*,
811 A.2d 10 (Pa. Super. Ct. 2002) ............................................................. 22, 27

*Fin. Software Sys., Inc.* v. *Philippe Lecocq*,
No. 07-3034, 2008 WL 2221903 (E.D. Pa. May 29, 2008) ..................................... 32

*Fletcher-Harlee Corp.* v. *Szymanski*,
936 A.2d 87 (Pa. Super. Ct. 2007) ................................................................. 34

*Fogel Refrigerator Co.* v. *Oteri*,
137 A.2d 225 (Pa. 1958) .............................................................................. 19

*Hutchison* v. *Sunbeam Coal Corp.*,
519 A.2d 385 (Pa. 1986) .......................................................................... 20, 21

*Interactive Intelligence, Inc.* v. *KeyCorp*,
546 F.3d 897 (7th Cir. 2008) .................................................................... 18, 28

*JHE, Inc.* v. *SEPTA*,
No. 1790 Nov. Term 2001, 2002 WL 1018941 (Pa. Com. Pl. May 17, 2002) ............... 19

*Kahan Novoa* v. *Safra Nat'l Bank of N.Y.*,
313 F. Supp. 2d 1347 (S.D. Fla. 2003) ............................................................ 30

*Kaiser* v. *First Hawaiian Bank*,
30 F. Supp. 2d 1255 (D. Haw. 1997) ............................................................... 31

*Kane* v. *Mfrs. Life Ins. Co.*,
Civ. A. No. 08-4581 (KSH), 2010 WL 5466401 (D.N.J. Dec. 31, 2010) ....................... 4

*KP First Ave., L.P.* v. *Prentiss Props. Acquisition Partners*, L.P.,
    No. CIV. A. 01-1396, 2001 WL 438416 (E.D. Pa. Apr. 26, 2001) ................................ 31

*Lenzi* v. *Hahnemann Univ.*,
    664 A.2d 1375 (Pa. Super. Ct. 1995) ................................................................ 16

*Lewis* v. *Delp Family Powder Coatings, Inc.*,
    Civ. A. No. 08-1365, 2011 WL 1230207 (W.D. Pa. Mar. 31, 2011) ............................ 23

*Lipuma* v. *Am. Express Co.*,
    406 F. Supp. 2d 1298 (S.D. Fla. 2005) .................................................... 1, 18

*Lumax Indus., Inc.* v. *Aultman*,
    669 A.2d 893 (Pa. 1995) ........................................................................... 34

*Martz* v. *PNC Bank, N.A.*,
    No. Civ. A. 06-1075, 2006 WL 3840354 (W.D. Pa. Nov. 30, 2006) ............................ 24

*McCann* v. *Lucky Money, Inc.*,
    29 Cal. Rptr. 3d 437 (Cal. Ct. App. 2005) ...................................................... 29

*McHale* v. *NuEnergy Group*,
    Civ. A. 01-4111, 2002 WL 321797 (E.D. Pa. Feb. 27, 2002) ........................................ 19

*Merrill Lynch, Pierce, Fenner & Smith* v. *Perelle*,
    514 A.2d 552 (Pa. Super. Ct. 1986) ................................................................ 31

*In re Mexico Money Transfer Litig.*,
    267 F.3d 743 (7th Cir. 2001) ...................................................................... 29

*Mickle* v. *Christie's, Inc.*,
    207 F. Supp. 2d 237 (S.D.N.Y. 2002) .............................................................. 31

*Miners, Inc.* v. *Alpine Equip. Corp.*,
    722 A.2d 691 (Pa. Super. Ct. 1998) ................................................................ 34

*Murphy* v. *Duquesne Univ. of The Holy Ghost*,
    777 A.2d 418 (Pa. 2001) ........................................................................... 16

*In re Mushroom Transp. Co., Inc.*,
    382 F.3d 325 (3rd Cir. 2004) ...................................................................... 30

*Northview Motors, Inc.* v. *Chrysler Motors Corp.*,
    227 F.3d 78 (3d Cir. 2000) ........................................................................ 20

*In re NYSE Specialists Sec. Litig.*,
    260 F.R.D. 55 (S.D.N.Y. 2009) .................................................................... 10

*Packer Soc. Hill Travel Agency, Inc.* v. *Presby. Univ.*,
    635 A. 2d 649 (Pa. Super. Ct. 1993)......................................................................... 33

*Pension Benefit Guar. Corp.* v. *White Consol. Indus., Inc.*,
    998 F.2d 1192 (3d Cir. 1993)..................................................................................... 4

*Perkins v. Silverstein*,
    939 F.2d 463 (7th Cir. 1991) .................................................................................... 12

*Phillips* v. *Cnty. of Allegheny*,
    515 F.3d 224 (3d Cir. 2008)..................................................................................... 14

*Rambo* v. *Greene*,
    No. 03894, 2005 WL 579943 (Pa. Com. Pl. Feb. 28, 2005)..................................... 19

*In re Resorts Int'l, Inc.*,
    181 F.3d 505 (3d Cir. 1999)....................................................................................... 7

*Sanchez* v. *Am. Express Travel Related Servs. Co., Inc.*,
    865 N.E.2d 410 (Ill. App. Ct. 2007) ........................................................................ 29

*Sebastian Holdings, Inc.* v. *Deutsche Bank AG*,
    78 A.D.3d 446, 912 N.Y.S.2d 13 (N.Y. App. Div. 2010) ....................................... 29

*Shehadi* v. *Ne. Nat'l Bank of Pa.*,
    378 A.2d 304 (Pa. 1977) .......................................................................................... 18

*Sigma Supplies Corp.* v. *Progressive Halcyon Ins.*,
    No. 02968, 2004 WL 960011 (Pa. Com. Pl. Apr. 23, 2004) .................................... 19

*Smalich* v. *Westfall*,
    269 A.2d 476 (Pa. 1971) .......................................................................................... 26

*Srein* v. *Frankford Trust Co.*,
    323 F.3d 214 (3d Cir. 2003)..................................................................................... 30

*Stone* v. *Norwegian Cruise Line*,
    No. 01-1343, 2001 WL 877580 (E.D. Pa. May 15, 2001)......................................... 4

*Touraine Partners* v. *Kelly*,
    482 A.2d 240 (Pa. Super. Ct. 1984).......................................................................... 17

*U.S. Small Bus. Admin.* v. *Progress Bank*,
    Civ. A. 03-3461, 2004 WL 2980412 (E.D. Pa. Dec. 22, 2004)............................... 19

*U.S. Steel Corp.* v. *Lumbermens Mut. Cas. Co.*,
    Civ. A. No. 02-2108, 2005 WL 2106580 (W.D. Pa. Aug. 31, 2005) ...................... 16

*USX Corp.* v. *Prime Leasing Inc.*,
  988 F.2d 433 (3d Cir. 1993)........................................................................... 20, 21

*Valley Forge Convention & Visitors Bureau* v. *Visitor's Servs., Inc.*,
  28 F. Supp. 2d 947 (E.D. Pa. 1998) ................................................................. 28

*Walker* v. *S.W.I.F.T. SCRL*,
  *517 F. Supp. 2d 801 (E.D. Va. 2007)* ............................................................ 12

*Wiernik* v. *PHH U.S. Mortg. Corp.*,
  736 A.2d 616 (Pa. Super. Ct. 1999)................................................................. 23

*Wilmington Leasing, Inc.* v. *Parrish Leasing Co., L.P.*,
  Civ. A. No. 15202, 1996 WL 752364 (Del. Ch. Dec. 23, 1996) ..................... 31

*Wilson Area Sch. Dist.* v. *Skepton*,
  895 A.2d 1250 (Pa. 2006) ........................................................................... 23, 24

## STATUTES

42 P.S. § 5524 ..................................................................................................... 32

42 P.S. § 5525 ..................................................................................................... 32

## OTHER AUTHORITIES

Fed. R. Civ. P. 10(c) ........................................................................................... 12

Fed. R. Civ. P. 11 ............................................................................................... 12

Fed. R. Civ. P. 12(b)(6)..................................................................................... 1, 14

Nat'l Ass'n of Sec. Dealers Rule 2320(a) .......................................................... 17

Nat'l Ass'n of Sec. Dealers Rule 2440 .............................................................. 18

Webster's Seventh New Collegiate Dictionary (1971)....................................... 17

Defendants The Bank of New York Mellon Corporation ("BNY Mellon Corp."), Mellon Bank N.A. ("Mellon"), and The Bank of New York Mellon ("BNY Mellon") submit this memorandum of law in support of their motion to dismiss the Second Amended Class Action Complaint (the "Complaint") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

Plaintiff Southeastern Pennsylvania Transportation Authority ("SEPTA") acknowledges that BNY Mellon provides certain custodial and foreign exchange ("FX") services to it pursuant to written agreements. (¶¶ 17-20, 31-34, 70(e), 95, 98, 102.)[1]  Yet its Complaint is predicated on purported obligations regarding pricing of FX services that are *directly and explicitly contradicted* by those agreements.  SEPTA's breach of contract claim is precluded because SEPTA has not pleaded facts supporting any breach of the actual terms of those agreements.  Its other legal theories are equally defective because Pennsylvania law, which governs SEPTA's claims, precludes the use of tort, quasi-contract or implied contract claims – here, breach of fiduciary duty, unjust enrichment and breach of implied covenant of good faith and fair dealing – to supplant or alter the express agreement between the parties.

SEPTA alleges that BNY Mellon acted as its agent when providing FX services, but failed to pass along to SEPTA "market" rates (apparently referring to the interbank market)[2]

---

[1]  Citations in the form of paragraph numbers refer to the Complaint unless otherwise noted.  In accordance with the convention used in the Complaint, references to BNY Mellon include Mellon unless otherwise noted.

[2]  The Complaint is premised on the assertion that BNY Mellon failed to provide SEPTA with "market" or "prevailing" FX rates at the time of FX transactions. (¶¶ 40, 42, 47, 63, 70(b)-(c), 70(e), 82(a)-(b), 84, 104.)  While not completely clear, the Complaint appears to allege that the interbank exchange rate represents the "market" or "prevailing" rate for all of the challenged FX transactions regardless of the size of the transactions or the complexity of the transactions. (*See, e.g.*, ¶ 43 (graphic using the interbank rate to calculate BNY Mellon's alleged profit).)  The interbank rate is the wholesale rate at which the largest and most secure financial services institutions exchange large volumes of currencies (typically, $1 million or more) on an arm's-length basis. *See, e.g.*, *Lipuma* v. *Am. Express Co.*, 406 F. Supp. 2d 1298,

prevailing at the time each FX trade was executed.  However, SEPTA's agreement with BNY Mellon governing FX transactions contains specific provisions regarding pricing that call for something quite different.  It does not call for BNY Mellon to execute SEPTA's FX trades on the interbank or any other markets.  Rather, it provides that BNY Mellon will act "on a principal basis" in its FX transactions for SEPTA – that is, transacting with SEPTA, as counterparty, from its own currency account.  The agreement also specifies how such transactions will be priced.  It states that BNY Mellon will offer SEPTA guaranteed exchange rates each morning.  SEPTA, through its professional third-party investment managers, is free to accept those rates, to negotiate different rates with BNY Mellon, or to take its transaction elsewhere.  Indeed, not only does the agreement *not* require that BNY Mellon execute SEPTA's FX transactions *at* prevailing interbank market rates, as the Complaint claims, it instead provides that the rates BNY Mellon offers can be up to three percent *outside* those rates.  There is no factual allegation in the Complaint that BNY Mellon ever executed a FX transaction with SEPTA that did not conform to these contractual terms.  Nor is there any allegation that BNY Mellon failed to report promptly and accurately the exchange rate it actually provided SEPTA in any transaction.

Instead, SEPTA invents a purported pricing obligation entirely different from, and inconsistent with, what the parties agreed to.  It does so by taking a phrase – "best execution" – from a promotional page on BNY Mellon's current website and claiming that this imposed a retroactive obligation to have priced at interbank market rates throughout the history of the parties' dealings, rather than on the terms of its agreement with BNY Mellon.  The term "best execution," however, is not part of the express contract between the parties.  Nor does SEPTA allege it ever saw or relied on that term when it engaged or transacted with BNY Mellon.  And,

---

1300 (S.D. Fla. 2005).  These rates are available only to the large institutions that participate in the interbank market, not to consumers or for smaller transactions.  *Id.*

most importantly, SEPTA ignores the fact that the promotional webpage on which it relies expressly defines "best execution" as relating to efficient administration and not pricing.

The Complaint asserts four claims:  breach of fiduciary duty, unjust enrichment, breach of contract, and breach of the implied duty of good faith and fair dealing.  Each of these claims should be dismissed with prejudice, for the following reasons:

*First*, under the plain language of the contracts at issue, SEPTA has failed to plead facts supporting a claim of breach of contract.

*Second*, Pennsylvania law forbids use of an implied covenant of good faith and fair dealing to impose terms inconsistent with those expressly agreed by the parties.

*Third*, Pennsylvania law forbids the recasting of a claim premised on a contractual duty into a claim of breach of fiduciary duty, and bars claims for unjust enrichment when an express contract governs the relationship between the parties.

*Fourth*, the breach of fiduciary duty and unjust enrichment claims also fail because no fiduciary duty existed here with respect to FX services; and even if such a duty existed, it would not entail obligations inconsistent with an agreement between the parties.

*Fifth*, while the Complaint does not specify a clear starting date for the putative class period, its claims are time-barred with respect to transactions occurring prior to the applicable statute of limitations of each claim.

*Sixth*, Defendant BNY Mellon Corp., the parent holding company, should be dismissed for the additional reason that the Complaint does not contain factual allegations against it and is not sufficient to hold it liable for the acts of its subsidiaries.

## STATEMENT OF FACTS

The Complaint contains allegations relating to both custodial and FX services. The terms governing BNY Mellon's provision of these services were set forth in separate written

agreements between Plaintiff and BNY Mellon:  (1) a Master Trust Agreement (as amended)
governing custodial services, signed by a representative of SEPTA (¶ 17; *see also* Compl. Exs.
A-B); and (2) Foreign Exchange Procedure Forms, under which SEPTA acknowledges and
agrees to BNY Mellon's FX Program Procedures, signed by SEPTA's investment managers that
make use of BNY Mellon's FX services and by SEPTA itself in connection with a trading
account.  (¶ 31; *see also* Brennan Decl. Exs. 1-4 (signed Foreign Exchange Procedure Forms).)

   In ruling on a motion to dismiss, the Court may consider the factual allegations in
the Complaint, the exhibits attached to it, the documents that are referred to or incorporated by
reference in it, and documents on which the Plaintiff's claim is based.  *In re Burlington Coat
Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).  Where a complaint alleges the
existence of a contract between the parties and relies on the contract for certain of its allegations,
as the Complaint does here (¶¶ 17-20, 31-34, 70(e), 95, 98, 102), the Court may consider that
written contract on a motion to dismiss.  *Pension Benefit Guar. Corp.* v. *White Consol. Indus.,
Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993); *Kane* v. *Mfrs. Life Ins. Co.*, Civ. A. No. 08-4581
(KSH), 2010 WL 5466401, at *6 n.6 (D.N.J. Dec. 31, 2010); *Stone* v. *Norwegian Cruise Line*,
No. 01-1343, 2001 WL 877580, at *1 (E.D. Pa. May 15, 2001).

## A.  The SEPTA Master Trust Agreement

   The basic agreement between the parties is a Master Trust Agreement ("MTA")
governing the custody and investment of assets of certain employee pension benefit plans.  (¶ 17
& Compl., Exs. A-B.)  The MTA was dated February 15, 1990.  (Compl., Ex. A.)  It was
subsequently amended ("MTA Amend.") in or about July 1999.  (Compl., Ex. B.)

   The MTA provides, in summary, that, after an initial period in which BNY
Mellon may play a role in investments, that role will be assumed by independent third-party
investment managers hired by SEPTA that will be solely responsible for directing SEPTA's

4

investments.  BNY Mellon will thereafter provide only custodial services, as well as such other

services as the parties may agree to separately.  Thus, once SEPTA appoints third-party

investment managers, BNY Mellon's job is to carry out the directions of the investment

managers.

The MTA, as amended, works as follows:

It first establishes a trust consisting of such money and property as SEPTA elects

to contribute.  (MTA § 2.1.)  Mellon is designated as the "Master Trustee."[3]  (MTA § 2.5.)

SEPTA's Transportation Board is granted authority to issue "investment policies, objectives and

guidelines" for the trust and appoints "Investment Managers or other fiduciaries" to exercise

"discretion and control" over specified portions of the assets.  (MTA §§ 5.1(a), 5.1(b)(i), 5.2(a).)

Upon their appointment, those professional managers relieve BNY Mellon of any and all

investment-related duties and responsibilities:

> 5.2  <u>Investment by Fiduciary</u>.  (a)  It is contemplated that the
> Board will from time to time appoint one or more Investment
> Managers or other fiduciaries (referred to hereinafter in this
> Section 5.2 as "Fiduciary" or "Fiduciaries") to manage specified
> portions of the Master Trust Fund.  Upon the appointment of each
> Fiduciary, the Board shall so notify the Master Trustee and instruct
> the Master Trustee in writing to separate into a separate account
> those assets as to which each Fiduciary has discretion and control.
> The Fiduciary shall designate in writing the person or persons who
> are to represent any such Fiduciary in dealings with the Master
> Trustee.  *Upon the separation of the assets in accordance with the
> instructions of the Board, the Master Trustee, as to those assets,
> shall be released and relieved of all investment duties,
> responsibilities and liabilities normally or statutorily incident to a
> trustee as to such separate account, and thereafter shall act in the
> capacity of custodian of such assets.* . . .

(MTA § 5.2(a) (emphasis added).)

---

[3]  The Complaint alleges that BNY Mellon replaced Mellon as the Master Trustee in
approximately 2007.  (¶ 14.)

The Master Trustee may invest and reinvest assets only "[t]o the extent that assets of the Master Trust Fund have not been allocated under Section 5.2 to the investment control of an Investment Manager or other fiduciary."  (MTA § 5.4.)  During the period the Master Trustee has investment duties – but *only* during that period – it (like all "Investment Managers or other fiduciaries" under Section 5.2) is required to discharge its "investment duties" under the prudent man standard.  (MTA Amend. ¶ 7 (amending § 6.1).)  However:

> Whenever the Master Trustee is required to follow the Authorized Instructions of a Fiduciary, the Master Trustee and the Fiduciary *shall not be deemed to have been assigned a shared responsibility*. The Fiduciary giving the Authorized Instructions shall have the sole responsibility for the functions and duties assigned to it, including issuing such Authorized Instructions.

(MTA Amend. ¶ 6 (amending § 5.2(a)) (emphasis added).)  Once investment managers have been appointed, BNY Mellon has specified powers relating to the purchase, sale and exchange of assets and other similar duties, but may exercise them "only on the direction of an Investment Manager or other fiduciary."  (MTA § 7.1.)  The MTA provides that BNY Mellon "shall be entitled to rely on and shall be fully protected in acting in accordance with all such Authorized Instructions."  (MTA Amend. ¶ 4 (amending § 3.3).)  Thus, BNY Mellon's investment duties, and any fiduciary duties that accompany them, last *only* until investment managers are appointed.

SEPTA does not allege – and could not truthfully allege – that any portion of SEPTA's assets remained unallocated to third-party investment managers during any period relevant to this action.  Nor does SEPTA allege – nor could it truthfully allege – that BNY Mellon was subject to any of the investment-related fiduciary duties established in the MTA.  To the contrary, SEPTA alleges only that BNY Mellon provided custodial and FX services – *not* investment services.  (¶¶ 12, 14-15, 82(c).)

6

Investment managers are responsible for deciding what FX services to use and on what terms to convert any funds under their discretion and control that require the use of FX services.  (*See, e.g.,* ¶¶ 25 ("clients or third party investment managers communicate trade requests to a BNY Mellon representative" and "accept or reject" FX rate quotes), 26 (describing situations where BNY Mellon's clients (or the clients' investment managers) instruct BNY Mellon to use its standing instruction FX services), 40 (BNY Mellon executes standing instruction trades after "receiv[ing] instructions").)   SEPTA's investment managers are free to use any FX dealer's services.  BNY Mellon is not responsible for exercising discretion to decide with whom and on what terms SEPTA converts currency, but – as with all authorized instructions – is responsible for properly executing the FX instructions of SEPTA's investment managers.  (MTA § 7.1.; MTA Amend. ¶ 4 (amending § 3.3).)  The MTA does not contain any terms for the provision of FX services by BNY Mellon to SEPTA.[4]

The MTA does permit BNY Mellon to "provide such ancillary services as SEPTA and the Master Trustee may agree upon from time to time."  (MTA § 9.1.)  BNY Mellon

---

[4]   The only reference to FX transactions in the MTA cited in the Complaint is the power to "take any and all actions necessary to settle transactions in futures and/or options contracts, short-selling programs, foreign exchange or foreign exchange contracts, swaps and other derivative investments."  (¶ 19 (citing MTA Amend. ¶ 31 (amending § 8.1)).)  "Settlement" is the routine custodial service consisting of "the completion of a transaction: the seller transfers securities or financial instruments to the buyer and the buyer transfers money to the seller."  *Settlement*, The European Central Bank, http://www.ecb.int/paym/market/secmar/ settle/html/index.en.html (last visited July 8, 2011); *see also* Office of the Comptroller of the Currency, Comptroller's Handbook: Custody Services 19 (Jan. 2002) ("Trade settlement occurs when securities and money are moved to complete the trade"), *available at* http://www.occ.gov/static/publications/handbook/custodyservice.pdf (last visited July 8, 2011).  *Cf. In re Resorts Int'l, Inc.*, 181 F.3d 505, 515 (3d Cir. 1999) ("In the securities industry, a settlement payment is generally the transfer of cash or securities made to complete a securities transaction."); NYSE Euronext Glossary, http://www.nyse.com/glossary/1042235995818.html (last visited July 8, 2011) ("Settlement: The conclusion of a transaction in which parties pay for securities purchased and take delivery of securities sold.").

provides such services "in addition to the services rendered" under the MTA, and compensation for such services is agreed upon "in an arm's-length manner."  (MTA § 9.1.)

**B.      The Agreement Governing BNY Mellon's FX Services**

Among the ancillary services BNY Mellon offers to its customers are FX services.  These services entail converting U.S. dollars to foreign currencies when SEPTA's investment managers need those currencies to buy foreign assets, and converting foreign currencies to U.S. dollars when funds are being returned to the United States.  (¶ 21.)  An investment manager can, of course, negotiate a specific FX transaction directly with BNY Mellon or any other FX provider, including rates and terms, which the Complaint refers to as a "direct" FX transaction.  (¶ 25.)  Such transactions are not at issue here.

Rather, this lawsuit concerns "standing instruction" FX transactions.   (¶¶ 26-27.) SEPTA's investment managers who wished to use BNY Mellon's standing instruction FX services each executed a "Foreign Exchange Procedure Form" (the "FX Form").  (Brennan Decl. Exs. 1-3; *see also* ¶ 31 (BNY Mellon "requir[es] custodial clients (or their respective investment managers) to execute" the FX Form in order to use BNY Mellon's standing instruction FX services.).)  The FX Form provides, among other things, that the "Manager/Fiduciary acknowledges receipt of Mellon's Foreign Exchange Procedures (the 'Procedures') and agrees that all transactions processed through [Mellon's Global Securities Services], for trading with Mellon Bank N.A., will be executed pursuant to these Procedures."  (Brennan Decl. Exs. 1 at 1, 2 at 1; *accord* Ex. 3 at 1.)  Indeed, SEPTA itself signed the FX Form in 2007, agreeing that FX trades in an account would be executed pursuant to the Foreign Exchange Procedures.  (Brennan Decl. Ex. 4 at 1-3.)

Thus, BNY Mellon's Foreign Exchange Procedures – to which SEPTA's investment managers and SEPTA itself agreed – govern standing instruction FX transactions.

The Foreign Exchange Procedures in force since July 2008, and relied upon in the Complaint (¶¶ 32-34), are contained in a document titled "FX Program for Trade Requests Processed through BNY Mellon Custody" ("2008 FX Procedures") (Brennan Decl. Ex. 5).  Earlier versions of the document were titled "Mellon Foreign Exchange Procedures" (Brennan Decl. Ex. 6 ("2004 FX Procedures"); Ex. 7 ("2000 FX Procedures").)[5]  The relevant versions of the FX procedures do not differ from each other in respects material to this motion and are collectively referred to as the "FX Procedures" in this motion.

The process specified in the FX Procedures for execution of standing instruction FX transactions is the following:

- Every day by 9 a.m., BNY Mellon will establish and communicate a specific buy and sell rate for each of the currencies in which it deals (called the "Daily Schedule").  (¶ 34; *see also* 2008 FX Procedures at 1, 2004 FX Procedures at 1, 2000 FX Procedures at 1.)

- Also every day, BNY Mellon will advise participating investment managers of all FX conversions scheduled for that day under the standing instruction service by prior order of the manager.  An investment manager may also issue instructions to BNY Mellon to provide FX in connection with a specific transaction that day.  (2008 FX Procedures at 1, 2004 FX Procedures at 1-2, 2000 FX Procedures at 1-2.)

---

[5]   The current FX Procedures, which went into effect on or around July 1, 2008, are posted on BNY Mellon's website at https://gm.bankofny.com/FX/ErisaRates.aspx (last visited July 8, 2011).  (Brennan Decl. Ex. 5.)  The previous version of the procedures, the 2004 FX Procedures, went into effect on or around July 27, 2004.  (Brennan Decl. Ex. 6.)  BNY Mellon believes Exhibit 7 to the Brennan Declaration to be the FX Procedures in effect from at least 2000 until the 2004 FX Procedures came into effect.  Each of SEPTA's investment managers who used BNY Mellon's standing instruction FX services signed FX Forms acknowledging their receipt of and consent to the procedures.  (Brennan Decl. Exs. 1-3.)  As set forth in the FX Procedures, these investment managers agreed to be bound by subsequent modifications of the FX Procedures subsequent to their initial submission of a signed FX Form.  (2008 FX Procedures at 2; 2004 FX Procedures at 3; 2000 FX Procedures at 3.)

- The manager must decide by 11:00 a.m. Eastern Time whether it wants to use BNY Mellon for that day's scheduled FX transactions and, if so, whether it wants its transactions executed under the standing instruction program.  It can elect to do its transaction with a party other than BNY Mellon, taking on the responsibility of arranging that transaction.  It can also directly negotiate the transaction with BNY Mellon.  If it decides to use BNY Mellon's standing instruction program for the transaction, it will receive "a rate not less favorable than indicated" on that day's Daily Schedule.[6]  (¶ 34; *see also* 2008 FX Procedures at 1-2, 2004 FX Procedures at 1-2, 2000 FX Procedures at 1-2.)

- If the investment manager elects to use BNY Mellon for an FX transaction, BNY Mellon acts "*on a principal basis*."  (¶ 34 (emphasis added); *see also* 2008 FX Procedures at 1, 2004 FX Procedures at 1, 2000 FX Procedures at 1.)  Thus, BNY Mellon does not act as an agent, arranging or executing the FX transaction on SEPTA's behalf with outside parties or on outside markets.  Rather, it is actually buying or selling for its own account, and at its own risk, the currency that SEPTA's investment manager wishes to exchange.[7]

Thus, BNY Mellon is required to give each investment manager a price it will honor (or better) that day, regardless of how the market might move during the day.  The

---

[6] To comply with an ERISA requirement that is inapplicable to this matter because SEPTA is not an ERISA plan, the current FX Procedures (in effect since 2008) also provide that customers will not be provided an FX rate that deviates by more than three percent from the interbank bid and ask rates.  (2008 FX Procedures at 1-2.)  There is no allegation that BNY Mellon ever failed to comply with this provision.

[7] *See, e.g.*, *In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 61 (S.D.N.Y. 2009) (describing how New York Stock Exchange specialists may trade "on a principal basis" by selling or buying stock from their own account); *In re Enron Corp. Sec. Derivative & "ERISA" Litig.*, 540 F. Supp. 2d 759, 784 (S.D. Tex. 2007) (noting that a dealer was "acting as a principal, not as an agent, in selling commercial paper for its own account to Plaintiffs").

manager can then consider that price in light of other factors, such as the nature and size of the

transaction, the difficulty of trading in whatever currency may be involved, the cost of arranging

a transaction elsewhere, prices then available on the foreign currency markets or from competing

FX providers, and its desire to avoid exposure to adverse currency market movements.

Understanding that it can count on receiving only the rate guaranteed by BNY Mellon, the

investment manager must then exercise its fiduciary duties to SEPTA and decide whether to

conduct the exchange at BNY Mellon or elsewhere.

It is notable that these Procedures *do not* provide that BNY Mellon will be acting

as SEPTA's agent in these transactions, that it will place SEPTA's order on currency markets, or

that it will pass along to SEPTA any gains or losses if those markets move favorably or

unfavorably to SEPTA.  Nor do the Procedures provide for fiduciary duties.  To the contrary, the

FX Procedures expressly provide that BNY Mellon is offering to buy or sell the currency to or

from SEPTA, from its own account, acting as a principal, at a price no less favorable than the

one specified on the Daily Schedule; it is BNY Mellon that is exposed to the benefit or risk of

currency market fluctuations.[8]  (2008 FX Procedures at 1-2; 2004 FX Procedures at 1-2; 2000

FX Procedures at 1-2.)  While BNY Mellon can, if it chooses, provide a better price than that

specified on the Daily Schedule, the FX Procedures place it under no obligation whatsoever to do

so.  SEPTA, through its investment managers, can choose each day whether to proceed on those

terms.

---

[8]     Because BNY Mellon buys or sells currency that it owns – and may have acquired at a
different time – to a customer rather than obtaining the currency through the interbank
market, BNY Mellon's profit (or loss) for both direct and indirect FX transactions may not
correspond to the difference between the rate charged a customer and the interbank rate at
that moment, as suggested in the Complaint (see ¶ 43 (graphic from *Wall Street Journal*
article calculating BNY Mellon's profit as the difference between the rate provided a
customer and the prevailing interbank rate)).

If the investment manager elects to execute the transaction away from BNY Mellon, SEPTA pays a flat fee ($25 per transaction during the relevant period) to BNY Mellon as compensation in its role as custodian for settling and processing the transaction.  (Current MTA Fee Schedule, Brennan Decl. Ex. 8 at 2; *see also* ¶ 20.)  If the investment manager executes the transaction with BNY Mellon as principal, no fee is charged.  (Brennan Decl. Ex. 8; *see also* ¶ 28.)

BNY Mellon then provides SEPTA account statements showing the exchange rate that was used in the transaction.  (¶¶ 5, 57, 62-63.)  SEPTA or its investment manager can compare the rate it received with the market rates on any given day and determine whether it wants to continue making use of BNY Mellon's FX services.

C.     **The Allegations in the Complaint**

The Complaint's allegations regarding BNY Mellon's purported conduct rely almost entirely on allegations taken from complaints filed in two qui tam actions against BNY Mellon and several *Wall Street Journal* articles.[9]  (*See* Compl. introduction n.1, ¶¶ 28, 40-44, 53-55.)  In short, the Complaint asserts that BNY Mellon breached its fiduciary and contractual duties to SEPTA and was unjustly enriched by charging FX rates that were higher than those that

---

[9]     Courts have held that newspaper articles should not be allowed to be considered part of a complaint unless "the referenced document [is] central or integral to the claim in the sense that its very existence, and not the mere information it contains, gives rise to the legal rights asserted."  *Walker* v. *S.W.I.F.T. SCRL*, 517 F. Supp. 2d 801, 806-07 (E.D. Va. 2007) (refusing to consider article that did not give rise to cause of action in complaint but instead merely reported information of questionable reliability because "[t]o conclude otherwise would allow parties to circumvent Rule 11's duty to conduct 'an inquiry reasonable under the circumstances,' and would serve to reduce that duty to the mere purchase of a newspaper") (internal citation omitted).  *See also Perkins* v. *Silverstein*, 939 F.2d 463, 467 n.2 (7th Cir. 1991) (finding that newspaper article that refers to alleged "'scandal' [is] not the type of documentary evidence or 'written instrument' which Fed. R. Civ. P. 10(c) intended to be incorporated into, and made a part of, the complaint").  For this reason, all references to the *Wall Street Journal* articles should appropriately be stricken.

BNY Mellon itself obtained during the day in the interbank currency market, thereby profiting from its provision of standing instruction FX services to SEPTA.  (¶¶ 4-5.)

Though the Complaint acknowledges the existence of the agreements between SEPTA and BNY Mellon (¶¶ 17-20, 31-34, 70(e), 95, 98, 102), it does not allege that BNY Mellon violated the pricing provisions set forth in those agreements – the FX Forms and the incorporated FX Procedures.  Rather, it disregards the express contractual terms and argues that BNY Mellon was obligated to follow an entirely different pricing regime from the one to which the parties agreed.  It asserts four claims:

- breach of a fiduciary duty to provide interbank rates, notwithstanding the contrary agreement of the parties;

- unjust enrichment in the form of any gains BNY Mellon earned by virtue of its provision of FX services at other than interbank rates;

- breach of contract on a theory that disregards the language of the actual agreement between the parties and relies instead on language taken from BNY Mellon's current website that is not part of the contract and says nothing about pricing; and

- breach of an implied covenant of good faith and fair dealing that purportedly overrides the express terms of the parties' agreement.[10]

## ARGUMENT

The Complaint should be dismissed because SEPTA's entire theory is inconsistent with the plain terms of the contractual relationship between the parties.  The factual allegations of the Complaint do not support a claim that Defendants violated those plain terms in

---

[10]   The Complaint also cites a document recently provided by BNY Mellon to clients describing its FX services.  (¶¶ 49-52; *see* Brennan Decl. Ex. 10.)  The Complaint quotes out of context a passage ("we tend to purchase currencies from our clients towards the low end of the interbank range and sell towards the high end"), taken from a sentence explaining that, through pricing pursuant to the FX Procedures, clients typically receive prices significantly better than those available at retail – the proper comparator, rather than interbank rates. (Brennan Decl. Ex. 10. at 3.)  The Complaint does not challenge the accuracy of this comparison to retail rates, nor does it identify any inconsistency between the description in this document and the terms of the contract.

their pricing of FX transactions, and therefore the breach of contract claim fails.  Moreover, Pennsylvania law, which governs this dispute,[11] precludes tort, quasi-contract, and implied contract claims such as those asserted here, where the duties of the parties are governed by an express contract.  The Complaint also fails to allege facts supporting the existence or breach of a fiduciary relationship.  Finally, the Complaint fails to allege any basis for naming The Bank of New York Mellon Corporation as a defendant, and is barred in part by the statute of limitations.

In evaluating a motion to dismiss under Rule 12(b)(6), a court must accept well-pleaded factual allegations in the Complaint as true, but need not accept as true conclusions unsupported by the facts alleged, legal conclusions, bald assertions or unwarranted inferences. *See Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555-56 (2007) (citing cases).  A complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft* v. *Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570).  To survive a motion to dismiss, a plaintiff must plead "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  Dismissal is appropriate where a plaintiff fails "to raise a right to relief above the speculative level."  *Phillips* v. *Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 545); *Bane* v. *City of Phila.*, Civ. A. No. 09-2798, 2009 WL 6614992, at *5 (E.D. Pa. June 18, 2009) (Slomsky, J.).

---

[11]   The MTA, as amended, provides that "[t]his Agreement shall be construed in accordance with and governed by the laws of the Commonwealth of Pennsylvania to the extent not preempted by Federal law.  The parties hereby also irrevocably submit to the exclusive jurisdiction of the state or federal courts in the Commonwealth of Pennsylvania."  (MTA Amend. ¶ 36 (amending § 19.1).)

# I.

## PLAINTIFF HAS FAILED TO STATE A CLAIM OF BREACH OF CONTRACT OR THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

SEPTA's claims of breach of contract (Counts III and IV) fail because its factual allegations do not identify conduct inconsistent with the agreements pursuant to which BNY Mellon provided custodial and FX services.  SEPTA has failed to state a claim either under the express terms of the contract or under an implied covenant of good faith and fair dealing.

### A.      Plaintiff Has Failed to Allege Facts Supporting a Plausible Inference that Defendants Breached the Express Terms of Their Contract

SEPTA's breach of contract claim is contradicted by the express terms of the contract on which it is based.  SEPTA bases its breach of contract claim on the FX Forms signed by SEPTA and its investment managers agreeing that FX transactions will be executed pursuant to BNY Mellon's FX Procedures.  (¶ 95; *see also* Brennan Decl. Exs. 1-4.)  But SEPTA's breach of contract claim does not actually identify any respect in which BNY Mellon breached any terms of these documents.  Rather, SEPTA claims BNY Mellon breached these agreements by failing to apply "best execution standards" (¶¶ 35-37, 97-98), a term it finds on a promotional webpage on BNY Mellon's current website and interprets to mean customers are and always were entitled to receive prevailing interbank rates without markup.  The term "best execution," however, is found nowhere in the FX Form or FX Procedures that constitute the contract.  Nor does SEPTA claim that it ever saw or relied on this language.  And it ignores the actual definition of the term that appears on the website page where it is used.  The claim fails for each of the following reasons:

*First*, SEPTA fails to allege a breach of the express terms of the agreement.  That agreement required BNY Mellon to do two things with respect to pricing:  (1) offer a guaranteed rate each morning; and (2) if SEPTA's investment manager elected to proceed with an FX trade

with BNY Mellon, execute the trade, as principal, at a price that is no worse than the guaranteed rate. (¶ 34.)  That was the deal.  There is no allegation in the Complaint that BNY Mellon ever executed an FX trade for any SEPTA account contrary to instructions by SEPTA or its investment managers, or at a price worse than that day's guaranteed rate.  That should be the end of the matter.

         *Second*, the "best execution" language upon which SEPTA relies to rewrite BNY Mellon's pricing obligations retroactively was not part of the FX contract between BNY Mellon and SEPTA.  The FX Forms that SEPTA and its investment managers signed acknowledge receipt of the FX Procedures and state that FX transactions will be executed "pursuant to these Procedures" or equivalent language.  (Brennan Decl. Exs. 1-4.)  Neither the FX Forms nor the FX Procedures use the term "best execution" on which SEPTA relies.  The webpage to which SEPTA refers to in its Complaint that does use that term, (¶ 33; *see also* Brennan Decl. Ex. 9), is not part of either the FX Forms or FX Procedures, nor is it incorporated by reference.  Rather, it is a distinct promotional page not linked to by the FX Procedures; indeed, SEPTA acknowledges that it is a separate "source" from the FX Procedures.  (¶ 33.)  It is therefore not part of the contract.  *See, e.g.*, *Murphy* v. *Duquesne Univ. of The Holy Ghost*, 777 A.2d 418, 435 (Pa. 2001) (concluding that a separate document was not part of a contract because "[n]othing in the Contract explicitly mentioned or referred to or incorporated by reference" the document); *Lenzi* v. *Hahnemann Univ.*, 664 A.2d 1375, 1380 (Pa. Super. Ct. 1995) (finding a separate policy document was not incorporated into a separation agreement based on "the prominent lack of any written incorporation by reference of the policy"); *U.S. Steel Corp.* v. *Lumbermens Mut. Cas. Co.*, Civ. A. No. 02-2108, 2005 WL 2106580, at *8 n.12 (W.D. Pa. Aug. 31, 2005) ("Although it is true that 'when a contract refers to a separate document, a court may examine the language of

the other document to ascertain the intent of the parties[,]' there is no language in the agreements

between the parties to suggest that the surety rate manuals were incorporated into the

agreements.") (citation omitted).[12]

    *Third*, SEPTA's interpretation of "best execution" ignores the explanation of that

term that appears on the very same page.  SEPTA contends that best execution means best price

(¶ 28), and best price means interbank rates without markup (¶ 84), thus overriding the express

terms of its agreement regarding pricing.  As the Complaint acknowledges, however, the

particular webpage on which SEPTA relies defines best execution as follows:

> We consider best execution, as it relates to the Standing Instruction
> process, as providing a consistent, accurate and efficient means of
> facilitating pre-trade, trade and post-trade activities.  These
> activities include identification of trade requirements, pre-trade
> administration associated with regulated markets, arranging
> settlement, reconciling discrepancies, posting cash to accounts and
> reporting all relevant transaction details to investment accounting
> systems.

(¶ 36; *see also* Brennan Decl. Ex. 9.)  By its plain language, this webpage defines "best

execution" in a way that has nothing to do with pricing, but instead concerns facilitation of

customer trades – identifying trade requirements, pre-trade administration, arranging settlement,

etc.  *See* Webster's Seventh New Collegiate Dictionary (1961) (defining "execute" to mean "1.

to put into effect: carry out: perform").  There is nothing on this webpage to suggest that it is

intended to override an express, written pricing agreement between the parties.[13]

---

[12] *Cf. Bourke* v. *Kazaras*, 746 A.2d 642, 645 (Pa. Super. Ct. 2000) (advertisements are not
contracts, but "are merely invitations to the public to enter into negotiations which may
subsequently result in an offer and an acceptance."); *accord Touraine Partners* v. *Kelly*, 482
A.2d 240, 246 (Pa. Super. Ct. 1984).

[13] SEPTA's interpretation of "best execution" is presumably an attempt to import into the world
of FX trading an obligation imposed on broker-dealers with respect to securities trading.  *See,
e.g.*, Nat'l Ass'n of Sec. Dealers ("NASD") Rule 2320(a) (obligation of broker-dealer to "use
reasonable diligence to ascertain the best market for the subject security and buy or sell in

*Fourth,* even if the website's use of the term "best execution," taken alone, could be read to bear implicitly on pricing – which it cannot – well-established rules of contract interpretation provide that the express terms of the contract relating to pricing would prevail.  As the Complaint concedes, the express terms of the FX Procedures address pricing, including:  that BNY Mellon acts "on a principal basis," rather than taking SEPTA's trades and executing them on the interbank or other FX markets; the process by which BNY Mellon will set daily FX rates; and the process by which SEPTA and its investment managers will either accept or decline those rates.  (¶ 34.)  Contrary to SEPTA's argument that BNY Mellon was required by the "best execution" language to give it the benefit of interbank market rates, the express terms of the FX Procedures contain no undertaking to provide interbank rates, and the current version expressly contemplates rates up to three percent outside interbank rates.  (*Id.*)  Where, as here, a plaintiff attempts to read general language of this sort to conflict with the express terms of a written contract, Pennsylvania law precludes the claim.  *Shehadi* v. *Ne. Nat'l Bank of Pa.*, 378 A.2d 304,

---

such market so that the resultant price to the customer is as favorable as possible under prevailing market conditions").  This attempt fails for several reasons.  First, there is no comparable legal or regulatory rule regarding pricing in the area of FX trading, and SEPTA does not allege otherwise.  *E.g., Interactive Intelligence, Inc.* v. *KeyCorp*, 546 F.3d 897, 899-901 (7th Cir. 2008) (rejecting claim based on failure to execute FX trades at market rate without spread); *Lipuma* v. *American Express Co.*, 406 F. Supp. 2d 1298, 1320-21 (S.D. Fla. 2005) (noting weakness of claim based on mark-ups of FX trades).  Second, even if an implied "best execution" duty existed under Pennsylvania law, it would be subject to any express agreements between the parties regarding pricing, such as those to which the parties agreed here.  *See* Section III.C, below.  And third, a broker-dealer subject to a best execution duty is still entitled to mark up the price to cover its costs and earn a profit.  *E.g.*, NASD Rule 2440 ("if a member buys for his own account from his customer, or sells for his own account to his customer, he shall buy or sell at a price which is fair, taking into consideration all relevant circumstances, including market conditions with respect to such security at the time of the transaction, the expense involved, and the fact that he is entitled to a profit . . . .").  Thus, even under the distinct regime that governs securities brokerage, SEPTA would not be entitled to have FX transactions executed at "the rates paid by the Fiduciary Defendants [BNY Mellon and Mellon] or . . . the prevailing rates at the time the FX trade was executed." (¶ 84.)

306 (Pa. 1977) ("one part of a contract cannot be so interpreted as to annul another part"); *Fogel Refrigerator Co.* v. *Oteri*, 137 A.2d 225, 233 (Pa. 1958) (same).

**B.    Plaintiff Has Failed to Allege a Breach of the Implied Covenant of Good Faith and Fair Dealing**

Count IV of the Complaint attempts to use an implied covenant of good faith and fair dealing to rewrite the express terms of SEPTA's agreement with BNY Mellon.  This claim fails because Pennsylvania law forbids use of this implied covenant to revise terms of an express contract.

As an initial matter, a plaintiff may not even plead a breach of the implied covenant of good faith and fair dealing when, as here, it is also suing for breach of contract.  "[A] plaintiff cannot seek to recover from a defendant on a separate theory of breach of implied duty of good faith and fair dealing while maintaining an action for breach of contract, which includes that duty." *U.S. Small Bus. Admin.* v. *Progress Bank*, Civ. A. 03-3461, 2004 WL 2980412, at *4 (E.D. Pa. Dec. 22, 2004); *see also McHale* v. *NuEnergy Group,* Civ. A. 01-4111, 2002 WL 321797, at *8 (E.D. Pa. Feb. 27, 2002) ("Pennsylvania law would not recognize a claim for breach of covenant of good faith and fair dealing as an independent cause of action separate from the breach of contract claim . . . ."); *JHE, Inc.* v. *SEPTA*, No. 1790 Nov. Term 2001, 2002 WL 1018941, at *7 (Pa. Com. Pl. May 17, 2002) ("this court holds that a breach of the covenant of good faith is nothing more than a breach of contract claim and that separate causes of action cannot be maintained for each, even in the alternative"); *Rambo* v. *Greene*, No. 03894, 2005 WL 579943, at *2 (Pa. Com. Pl. Feb. 28, 2005) (same); *Sigma Supplies Corp.* v. *Progressive Halcyon Ins.*, No. 02968, 2004 WL 960011, at *2 (Pa. Com. Pl. Apr. 23, 2004) (same).  Count IV of the Complaint should be dismissed for this reason alone.

Pleading defects aside, SEPTA cannot use the implied covenant of good faith and fair dealing with respect to matters addressed by express terms of its agreement.  In the words of the Third Circuit, "implied covenants and any express terms of a contract are necessarily mutually exclusive—one can invoke 'implied' terms only when there are no express terms in the contract relating to the particular issue." *USX Corp.* v. *Prime Leasing Inc.*, 988 F.2d 433, 438 (3d Cir. 1993) (applying Pennsylvania law) (quotation marks and citations omitted); *see also Northview Motors, Inc.* v. *Chrysler Motors Corp.,* 227 F.3d 78, 91 (3d Cir. 2000) (under Pennsylvania law, the duty of good faith "is not divorced from the specific clauses of the contract and cannot be used to override an express contractual term"); *Allstate Transp. Co., Inc.* v. *Se. Pa. Transp. Auth.*, No. Civ. A. 97-1482, 2000 WL 329015, at *19 (E.D. Pa. Mar. 27, 2000) ("[T]here can be no implied covenant as to any matter specifically covered by the written contract between the parties.")  This is an application of the established principle that "[t]he law will not imply a different contract than that which the parties have expressly adopted.  To imply covenants on matters specifically addressed in the contract itself would violate this doctrine." *Hutchison* v. *Sunbeam Coal Corp*., 519 A.2d 385, 388 (Pa. 1986).

The express contract at issue here – embodied in the FX Forms and FX Procedures – indisputably addressed the pricing of FX transactions.  Moreover, it provided a clear pricing mechanism and outer bounds on rates:  BNY Mellon provides guaranteed rates daily; SEPTA and its investment advisers accept or decline them; BNY Mellon acts as principal and buys from or sells to SEPTA from its own account; and the rates may not be outside interbank rates by more than three percent.  SEPTA now seeks to use an implied covenant to impose an entirely different mechanism, under which BNY Mellon must place SEPTA's FX trades on an outside market at exactly the market rate prevailing at that moment.  Not only do the

contract terms "relat[e] to the particular issue" as to which the implied covenant is sought, *USX Corp.* at 438, but SEPTA is seeking to imply "a different contract than that which the parties have expressly adopted," *Hutchison* at 388.  This it may not do.

Accordingly, SEPTA's claim for breach of the implied covenant of good faith and fair dealing should be dismissed with prejudice.

## II.

## PLAINTIFF CANNOT ASSERT TORT OR QUASI-CONTRACTUAL CLAIMS WHERE A CONTRACT GOVERNS THE MATTER IN DISPUTE

Because the propriety of the FX rates that BNY Mellon charged SEPTA was governed by a contract, SEPTA cannot expand its rights or alter BNY Mellon's rights or obligations by asserting tort or quasi-contract claims – here, claims of breach of fiduciary duty or unjust enrichment (Counts I and II) – with respect to the duties created by the contract.

### A.      Plaintiff's Breach of Fiduciary Duty Claim Is Barred Under Pennsylvania's "Gist of the Action" Doctrine

Under Pennsylvania law, the "gist of the action" doctrine precludes a plaintiff from pursuing a tort claim, including a breach of fiduciary duty claim, based on conduct grounded in a contract.  Because that is plainly what SEPTA is attempting to do here, its breach of fiduciary duty claim should be dismissed.

As Judge Buckwalter recently explained:

> As a general rule, Pennsylvania courts are cautious about permitting tort recovery on contractual breaches.  *Glazer* v. *Chandler*, 414 Pa. 304, 200 A.2d 416, 418 (1964).  In *eToll, Inc.* v. *Elias/Savion Adver., Inc.*, 811 A.2d 10 (Pa. Super. Ct. 2002), the Pennsylvania Superior Court emphasized that the "gist of the action" doctrine "is designed to maintain the conceptual distinction between breach of contract claims and tort claims [by] preclud[ing] plaintiffs from recasting ordinary breach of contract claims into tort claims." *Id.* at 14.

*Brown & Brown, Inc*. v. *Cola,* 745 F. Supp. 2d 588, 619 (E.D. Pa. 2010).  Any of four factors is

sufficient to bar tort claims under the gist of the action doctrine.

> The doctrine bars tort claims:  "(1) arising solely from a contract
> between the parties; (2) where the duties allegedly breached were
> created and grounded in the contract itself; (3) where the liability
> stems from a contract; or (4) where the tort claim essentially
> duplicates a breach of contract claim or the success of which is
> wholly dependent on the terms of a contract."

*Id.* at 619-20 (quoting *Sunburst Paper, LLC* v. *Keating Fibre Int'l,* Civ. A. No. 06-3959, 2006

WL 3097771, at *2 (E.D. Pa. Oct. 30, 2006)); *see also Am. Stores Props., Inc.* v. *Spotts, Stevens*

*& McCoy*, 651 F. Supp. 2d 349, 355 (E.D. Pa. 2009) (Slomsky, J.); *eToll, Inc.* v. *Elias/Savion*

*Adver., Inc.*, 811 A.2d 10, 19 (Pa. Super. Ct. 2002).  As shown below, all four factors are present

here.

"A breach of fiduciary duty claim is barred by the gist of the action doctrine if

the fiduciary duty alleged is grounded in contractual obligations."  *Brown & Brown*, 745 F.

Supp. 2d at 620 (quoting *Alpart* v. *Gen. Land Partners, Inc*., 574 F. Supp. 2d 491, 499 (E.D. Pa.

2008)).  While some fiduciary duties are outside the scope of the "gist of the action" doctrine

because they are imposed by society and not by contract, a tort claim may be brought only if the

contract is "collateral" to the dispute.  *Bohler-Uddeholm Am., Inc.* v. *Ellwood Group, Inc.*, 247

F.3d 79, 105 (3d Cir. 2001) (citing *Redevelopment Auth. of Cambria Cnty.* v. *Int'l Ins. Co.*, 685

A.2d 581, 590 (Pa. Super. Ct. 1996)).

Here, the gist of the action is whether BNY Mellon applied proper exchange rates

to SEPTA's FX transactions.  How those rates would be established, communicated, and

accepted or rejected was the subject of a detailed agreement between the parties.  Thus, (1) the

claim arises from the contract between the parties; (2) the duties allegedly breached were

"created and grounded in the contract itself"; (3) any liability would stem from the contract; and

(4) the breach of fiduciary duty claim would duplicate SEPTA's breach of contract claim; and its success is dependent on the terms of the agreement.  It therefore satisfies not just one but all four separate bases for invoking the gist of the action doctrine.  *See also Am. Stores Props.,* 651 F. Supp. 2d at 355 (precluding third-party beneficiary of a contract from pursuing a tort claim based on duties arising from contract); *Lewis* v. *Delp Family Powder Coatings, Inc.*, Civ. A. No. 08-1365, 2011 WL 1230207, at *7-10 (W.D. Pa. Mar. 31, 2011) (dismissing tort claim where liability stems from contractual relationship).

**B.      Plaintiff's Unjust Enrichment Claim Is Barred by Pennsylvania Law**

Pennsylvania law similarly precludes SEPTA's unjust enrichment claim.  "A plaintiff cannot recover for unjust enrichment when an express contract governs the relationship between the parties."  *Alpart*, 574 F. Supp. 2d 491 at 507 (citing *Hershey Foods Corp.* v. *Ralph Chapek, Inc.,* 828 F.2d 989, 999 (3d Cir. 1987), *Villoresi* v. *Femminella,* 856 A.2d 78, 84 (Pa. Super. Ct. 2004)).

To plead unjust enrichment under Pennsylvania law, a plaintiff must allege that: (1) the plaintiff conferred benefits upon the defendant; (2) the defendant appreciated and accepted such benefits; and (3) it would be inequitable for the defendant to retain the benefit without payment of the value.  *Wiernik* v. *PHH U.S. Mortg. Corp.*, 736 A.2d 616, 622 (Pa. Super. Ct. 1999); *see also Alpart*, 574 F. Supp. 2d at 507.  However, in the words of the Pennsylvania Supreme Court, "it has long been held in this Commonwealth that the doctrine of unjust enrichment is inapplicable when the relationship between parties is founded upon a written agreement or express contract, regardless of how 'harsh the provisions of such contracts may seem in the light of subsequent happenings.'"  *Wilson Area Sch. Dist.* v. *Skepton*, 895 A.2d 1250, 1254 (Pa. 2006) (quoting *Third Nat'l & Trust Co. of Scranton* v. *Lehigh Valley Coal Co.*, 44 A.2d 571, 574 (Pa. 1945)); *see also Curley* v. *Allstate Ins. Co.*, 289 F. Supp. 2d 614, 620-21

(E.D. Pa. 2003) ("[P]arties in contractual privity . . . are not entitled to the remedies available under a judicially-imposed quasi contract because the terms of their agreement (express and implied) define their respective rights, duties, and expectations."). The Pennsylvania Supreme Court has described this as a "bright-line rule." *Wilson Area Sch. Dist.*, 895 A.2d at 1254.

Because the entire relationship between SEPTA and BNY Mellon, and specifically the FX services, were indisputably based upon a written agreement, SEPTA's unjust enrichment claim should be dismissed. *See Alpart*, 574 F. Supp. 2d at 507 (dismissing unjust enrichment claim); *see also Martz* v. *PNC Bank, N.A.*, No. Civ. A. 06-1075, 2006 WL 3840354, at *2-4 (W.D. Pa. Nov. 30, 2006) (recommending dismissal of unjust enrichment claim because parties' relationship was founded on express contract).

## III.

## <u>PLAINTIFF FAILS TO ALLEGE A BREACH OF FIDUCIARY DUTY CLAIM</u>

Even if Pennsylvania law permitted SEPTA to assert a claim for breach of fiduciary duty, the Complaint would fail to do so because it does not plead facts showing the existence of a fiduciary relationship between BNY Mellon and SEPTA. To the contrary, the terms of the agreement between the parties show that no agency or control relationship exists here that could give rise to fiduciary duties.

The Complaint alleges two bases for inferring the existence of a fiduciary relationship. First, it alleges that BNY Mellon is a fiduciary of SEPTA under the MTA. (¶¶ 17, 19.) Second, it alleges that BNY Mellon occupied a superior position requiring that SEPTA repose its trust in it with respect to FX transactions. (¶ 82.) The facts properly before this Court contradict both allegations. Plaintiff's breach of fiduciary duty claim is also inconsistent with the written agreements between the parties.

24

**A.     The Master Trust Agreement Did Not Create a Fiduciary Relationship with Respect to FX Services**

The MTA provided that BNY Mellon assumes certain fiduciary duties, but those duties are limited to investment services provided under that Agreement prior to the appointment of investment managers.  Neither the MTA nor the separate agreement governing FX transactions creates any such duty with respect to FX services.

The MTA provides that "[t]he Master Trustee acknowledges that it assumes the fiduciary duties *established by this Agreement*."  (MTA § 12.1 (emphasis added).)  And it goes on to specify who is a "fiduciary":  those who invest SEPTA's assets.  (MTA § 5.2.)  It gives BNY Mellon such investment authority only "[t]o the extent that assets of the Master Trust Fund have not been allocated under Section 5.2 to the investment control of an Investment Manager or other fiduciary . . . ."  (MTA § 5.4.)  But once control is handed off to an "Investment Manager or other fiduciary," the MTA is clear that BNY Mellon no longer has such responsibilities:

> It is contemplated that the Board will from time to time appoint one or more Investment Managers or other fiduciaries (referred to hereinafter in this Section 5.2 as "Fiduciary" or "Fiduciaries") to manage specified portions of the Master Trust Fund. . . .  Upon the separation of the assets in accordance with the instructions of the Board, the Master Trustee, as to those assets, shall be released and relieved of all investment duties, responsibilities and liabilities normally or statutorily incident to a trustee as to such separate account, and thereafter shall act in the capacity of custodian of such assets.

(MTA § 5.2.)  It contains no provision for fiduciary duties with respect to investment activities after SEPTA has appointed its investment managers, but rather limits BNY Mellon's role to following the instructions of the investment managers and performing other administrative functions in its role as custodian.  (*Id.*; MTA Amend. ¶ 4 (amending § 3.3).)  In the context of FX transactions, that means that BNY Mellon must properly follow the FX instructions provided by SEPTA's investment managers.  It does not, for example, call for BNY Mellon to act as a

fiduciary with discretion to decide with whom and on what terms SEPTA converts currency. (MTA §§ 5.2, 7.1; MTA Amend. ¶¶ 4, 6 (amending §§ 3.3., 5.2(a)).)

More importantly, the separate agreements that specifically address FX services – the FX Form and FX Procedures – contain no provision for fiduciary duties.[14]  To the contrary, their express statement that BNY Mellon will act "*on a principal basis*" is inconsistent with the agency relationship upon which a fiduciary relationship could be based.  "[A]gency results only if there is an agreement for the creation of a fiduciary relationship with control by the beneficiary."  *Smalich* v. *Westfall*, 269 A.2d 476, 480 (Pa. 1971); *see also Basile* v. *H & R Block, Inc.*, 761 A.2d 1115, 1120 (Pa. 2000) (noting that agency relationship exists only where agreed by parties); *Devon IT, Inc.* v. *IBM Corp.*, Civ. A. No. 10-2899, 2011 WL 1331888, at *15-16 (E.D. Pa. Mar. 31, 2011) (Slomsky, J.) (dismissing a fiduciary duty claim because written agreement between the parties made clear defendant was not an agent of plaintiffs).  Thus, there is no factual basis for the claim that BNY Mellon expressly entered a fiduciary relationship with respect to FX services.

**B.     The Relationship Between BNY Mellon and SEPTA Did Not Create a Fiduciary Duty with Respect to FX Services**

Plaintiff's assertion that BNY Mellon had "discretion and control" over SEPTA's FX transactions sufficient to create a fiduciary relationship (¶ 81) is belied by the factual allegations before this Court.  To the contrary, SEPTA's investment managers, acting on SEPTA's behalf, had full power to decide whether or not to execute FX transactions with BNY Mellon based on disclosed guaranteed exchange rates.  BNY Mellon did not have discretion and control over FX decisions, but was obligated to follow the directions of the investment managers.

---

[14]     BNY Mellon does not provide its standing instruction FX services to SEPTA and its investment managers as part of the MTA, as is evident from the absence of any reference to any such services in the MTA.

(MTA §§ 5.2, 7.1; MTA Amend. ¶¶ 4, 6 (amending §§ 3.3., 5.2(a)).)

   The Complaint alleges that BNY Mellon had fiduciary duties because it "occupied a superior position over Plaintiff and the Class with respect to the execution of FX transactions" and had superior information about market rates, and that this "necessitated that Plaintiff and the Class repose their trust and confidence in Defendant" with respect to those transactions.  (¶ 82.)  While the facts do not support even those allegations, the test applied under Pennsylvania law is a stricter one:

> [A] fiduciary relationship [does not arise] merely because one party relies on and pays for the specialized skill or expertise of the other party. . . .  Rather, the critical question is whether the relationship goes **beyond** mere reliance on superior skill, and into a relationship characterized by "overmastering influence" on one side or "weakness, dependence, or trust, justifiably reposed" on the other side.  *Basile* v. *H & R Block,* 777 A.2d 95, 101 (Pa. Super. 2001).  A confidential relationship is marked by such a disparity in position that the inferior party places complete trust in the superior party's advice and seeks no other counsel, so as to give rise to a potential abuse of power.

*eToll*, 811 A.2d at 23 (emphasis in original); *see also Devon IT, Inc.* v. *IBM Corp.*, Civ. A. No. 10-2899, 2011 WL 1331888, at *15 (E.D. Pa. Mar. 31, 2011) (Slomsky, J.) ("The [fiduciary] relationship exists when the inferior party places 'complete trust in the superior party's advice and seeks no other counsel.'") (quoting *eToll*).

   This test is clearly not satisfied here.  SEPTA indisputably *did* seek and obtain "other counsel":  its third-party investment managers decided on a daily basis, in connection with every foreign exchange transaction, whether to execute the transaction with BNY Mellon. Moreover, they did so after receiving disclosure of the guaranteed exchange rates that SEPTA would receive.  They could then determine, in the exercise of their fiduciary duties, whether the FX rates offered by BNY Mellon that day warranted acceptance, or whether they should conduct

their FX transaction elsewhere.  They were free to look for better rates from other banks.  And after confirming the rate at which their trade occurred, the third-party managers could compare that rate with the range of FX rates on any given day to determine whether, on the next day, they would continue to exchange currency with BNY Mellon or find another firm that they believed would provide better FX services.  This is the antithesis of the sort of "overmastering influence" or "weakness, dependence, or trust" that Pennsylvania law requires before a fiduciary relationship can be imposed.  Rather, it is the sort of arm's-length commercial relationship from which the Pennsylvania courts have declined to infer fiduciary responsibilities.  *See, e.g.*, *Valley Forge Convention & Visitors Bureau* v. *Visitor's Servs., Inc.*, 28 F. Supp. 2d 947, 952-53 (E.D. Pa. 1998) (noting absence of cases in which a special relationship was found between parties to arm's-length business contracts).[15]

While SEPTA's failure to satisfy the standards for recognition of a fiduciary relationship under Pennsylvania law is enough to bar its claim, it bears noting that the case law does not generally recognize fiduciary duties either on the part of providers of FX services or custodians, in the absence of discretionary investment authority:

*FX Providers.*  The courts have repeatedly rejected customer claims against FX providers based on claims of fiduciary duty or charging "spreads" on prices.  For example, in *Interactive Intelligence, Inc.* v. *KeyCorp*, 546 F.3d 897, 900-01 (7th Cir. 2008), a commercial customer alleged that its bank breached fiduciary duties by overcharging it for FX transactions in the form of an undisclosed "spread."  The customer claimed – like SEPTA here – that the bank

---

[15]  *See also Devon IT*, 2011 WL 1331888, at *15-16 (dismissing plaintiffs' fiduciary duty claim because defendant did not have overmastering influence over plaintiffs in their business relationship); *Coldwell Banker Commercial/Feist* v. *BEF Corp.*, No. 2007-C-1707, 2007 WL 5023233 (Pa. Commw. Ct. Dec. 26, 2007) ("The notion that Wachovia may have had some kind of 'overmastering influence' over Coldwell Banker seems preposterous.").

was in a "superior position" and had a "substantial advantage" over it.  The court rejected the

notion that the bank owed a fiduciary duty, and held there "is nothing confidential in the FX

transaction."  *Id.* at 901; *see also Compania Sud-Americana de Vapores, S.A.* v. *IBJ Schroder*

*Bank & Trust Co.*, 785 F. Supp. 411, 425-427 (S.D.N.Y. 1992) (rejecting claim that provider of

FX services owed fiduciary duty to customer in case alleging that provider charged rates in

excess of prevailing market rate of exchange).  *Cf. In re Mexico Money Transfer Litig.*, 267 F.3d

743, 749 (7th Cir. 2001) (finding no misconduct in settling defendants' practice of charging an

undisclosed spread on FX transactions:  "Neiman Marcus does not tell customers what it paid for

the clothes they buy, nor need an auto dealer reveal rebates and incentives it receives to sell cars.

This is true in financial markets no less than markets for physical goods.").[16]

   *Custodians.*  Courts have reached the same conclusion with respect to custodians

that do not have discretionary investment authority.  For example, in *Beddall* v. *State Street Bank*

*& Trust Co.*, 137 F.3d 12 (1st Cir. 1998), the Court rejected plaintiff's assertion that the

defendant custodial bank had fiduciary responsibilities for the valuation of real estate

investments under the management of an investment manager, observing that the bank only had

"mechanical administrative responsibilities," such as retaining the assets, keeping a record of

their value, checking whether the investment manager's instructions are in a writing signed by an

authorized person, and issuing periodic reports.  *Id.* at 20-21; *see also Kahan Novoa* v. *Safra*

---

[16] *See also Sebastian Holdings, Inc.* v. *Deutsche Bank AG*, 78 A.D.3d 446, 447, 912 N.Y.S.2d 13, 15 (N.Y. App. Div. 2010) (holding that customer's alleged reliance on FX provider's superior knowledge does not give rise to fiduciary duty); *McCann* v. *Lucky Money, Inc.*, 29 Cal. Rptr. 3d 437, 449-50 (Cal. Ct. App. 2005) (holding that provider of FX services does not owe fiduciary duty to customer, in case alleging provider purchased foreign currency at a better exchange rate than rate given customer).  *Cf. Sanchez* v. *Am. Express Travel Related Servs. Co., Inc.*, 865 N.E.2d 410, 419 (Ill. App. Ct. 2007) (no deceptive act by FX provider in failing to disclose that it "purchased a commodity at a wholesale rate, which it then sold to the plaintiff at a marked-up retail rate").

*Nat'l Bank of N.Y.*, 313 F. Supp. 2d 1347, 1354 (S.D. Fla. 2003) (dismissing plaintiff's claim that defendant custodial bank had fiduciary duties to warn plaintiffs about investment risks:  "The only duties that [Defendant] owed to Plaintiffs relate to the administration of Plaintiffs' custody account.  These duties include safekeeping Plaintiffs' account and following Plaintiffs' instructions.")[17]

Plaintiff has therefore failed to allege facts sufficient to plead the existence of a fiduciary relationship with BNY Mellon relating to FX transactions.[18]

**C.     Plaintiff's Breach of Fiduciary Duty Claim Is Inconsistent with the Written Agreements Between the Parties**

Plaintiff's claim of breach of fiduciary duty fails for yet another reason: Pennsylvania law does not impose fiduciary duties that are inconsistent with the terms of an agreement between the parties.  Here, the FX Procedures are specific as to BNY Mellon's obligations to SEPTA.  SEPTA's claim is impermissibly predicated on different, and inconsistent, obligations.

Under Pennsylvania law, "[t]he existence and extent of the duties of the agent to the principal are determined by the terms of the agreement between the parties . . . ."  *Buchanan* v. *Brentwood Fed. Sav. & Loan Ass'n*, 320 A.2d 117, 128 n.21 (Pa. 1974).  The law does not recognize fiduciary obligations inconsistent with the operative agreement between the parties.

---

[17]   *See also In re Mushroom Transp. Co., Inc.*, 382 F.3d 325, 346-47 (3rd Cir. 2004) (directed trustee lacked a fiduciary duty because the trustee did nothing "more than serve as the holder of assets"); *Srein* v. *Frankford Trust Co.*, 323 F.3d 214, 221-23 (3d Cir. 2003) (custodian found to be fiduciary under ERISA when it exercised discretion over investments, not when it was acting as a "mere custodian of assets performing only administrative and ministerial duties"); *Ariz. State Carpenters Pension Trust Fund* v. *Citibank (Ariz.)*, 125 F.3d 715 (9th Cir. 1997) (custodian bank held not to be a fiduciary under ERISA because "[t]o become a fiduciary, the person or entity must have control respecting the management of the plan or its assets, give advice for a fee, or have discretionary responsibility in the administration of the plan").

[18]   Plaintiff's unjust enrichment claim is similarly deficient, as it also rests on the unsupported conclusion that BNY Mellon owed SEPTA a fiduciary duty.  (¶ 88.)

*See, e.g.*, *Merrill Lynch, Pierce, Fenner & Smith* v. *Perelle*, 514 A.2d 552, 562-63 (Pa. Super. Ct. 1986) (broker did not owe customer a fiduciary duty to explain margin call options; "such a requirement would impose upon Merrill Lynch an obligation inconsistent with the terms of its customer agreement as well as a duty not consistent with its obligations under applicable exchange rules"); *KP First Ave., L.P.* v. *Prentiss Props. Acquisition Partners*, L.P., No. CIV. A. 01-1396, 2001 WL 438416, at *3 (E.D. Pa. Apr. 26, 2001) (plaintiffs did not demonstrate a reasonable likelihood of success on the merits on their fiduciary duty claim because plaintiffs' fiduciary duty argument "runs smack into exclusionary language [of their agreement] that arguably allows [defendant] to do what it did").[19]

Here, the Complaint is founded on a flawed premise that is inconsistent with the FX Procedures:  that BNY Mellon, upon receiving a customer FX order, was obligated to go to the foreign currency markets, "execute FX transactions at the prevailing market rate at the time of the transaction" (¶ 82(b)), and pass on to SEPTA the rate received at the time of execution. Plaintiff also alleges that BNY Mellon set a price based on the least favorable rate offered that day, failed to tell Plaintiffs the time at which the order was executed, and profited improperly by its actions.  (¶¶ 4-5, 40-47, 57-63.)  The agreement between the parties, however, provides for something entirely different, as described in the preceding sections of this brief.

---

[19]  *See also Kaiser* v. *First Hawaiian Bank*, 30 F. Supp. 2d 1255, 1266 (D. Haw. 1997) ("The court will not impose a fiduciary duty that adds additional, potentially contradictory, duties to an express agreement of sophisticated parties negotiated at arms length.") (applying Pennsylvania contract law and Hawaii tort law); *Wilmington Leasing, Inc.* v. *Parrish Leasing Co., L.P.*, Civ. A. No. 15202, 1996 WL 752364, at *14 (Del. Ch. Dec. 23, 1996) ("Where, as here, a Partnership Agreement specifically addresses the rights and duties of the partners, any fiduciary duty that might be owed by the Limited Partners is satisfied by compliance with the applicable provisions of the partnership agreement."); *Mickle* v. *Christie's, Inc.*, 207 F. Supp. 2d 237, 244-45 (S.D.N.Y. 2002) (fiduciary duties do not override terms of agreement between parties).

The Complaint also purports to show that the FX transactions executed for SEPTA by BNY Mellon tended to be toward the lower end of the publicly available "daily FX price range" of currency trading on interbank markets for certain purportedly randomly selected transactions. (¶¶ 46-47.)  It does not, however, allege that these executions were at worse rates than those promised in BNY Mellon's Daily Schedule.  And in any event, both the execution prices and the daily interbank currency trading ranges were information available to SEPTA and its investment managers throughout the period at issue here.  That information undoubtedly informed – or should have informed – those managers in deciding whether to execute particular transactions with BNY Mellon (in light of its Daily Schedule's guaranteed exchange rate), or instead execute the transactions with other firms and accept the costs and market risks attendant on that decision.

Because the parties agreed at arm's-length to transact business on these terms, Plaintiff cannot assert a claim based on purported fiduciary duties to do business on the entirely different and inconsistent terms on which its Complaint is based.

## IV.

## <u>PLAINTIFF'S CLAIMS ARE TIME-BARRED</u>

While the Complaint does not specify a clear starting date for the putative class period, Plaintiff appears to be asserting its breach of contract, breach of fiduciary duty, and unjust enrichment claims starting in 2000.  (*See* ¶ 4.)  To the extent Plaintiff seeks to pursue claims that are barred under Pennsylvania's statutes of limitation for bringing actions for breach of fiduciary duty, 42 P.S. § 5524(7) (two years), unjust enrichment, 42 P.S. § 5525(a)(4) (four years), or breach of contract or the implied covenant of good faith and fair dealing, 42 P.S. § 5525 (four years), the claims should be dismissed.  *See Fin. Software Sys., Inc.* v. *Philippe Lecocq*, No. 07-3034, 2008 WL 2221903, at *3 (E.D. Pa. May 29, 2008) (fiduciary duty claim

barred by statue of limitations), *Cole* v. *Lawrence*, 701 A.2d 987, 989-90 (Pa. Super. Ct. 1997)

(unjust enrichment claim barred by statute of limitations), *Packer Soc. Hill Travel Agency, Inc.*

v. *Presby. Univ.*, 635 A. 2d 649, 652-53 (Pa. Super. Ct. 1993) (breach of contract claim barred

by statute of limitations); *Anserphone, Inc.* v. *Bell Atlantic Corp.*, 955 F. Supp. 418, 431 (W.D.

Pa. 1996) (breach of the duty of good faith and fair dealing claim barred for acts occurring more

than four years prior to commencement of action).

      Plaintiff was at all times able to perform the very analysis it now performs in

paragraphs 46 and 47 of its Complaint to demonstrate that it purportedly received unreasonably

low rates – comparing the rates it received on FX transactions with the publicly available "best

and worst" daily rates in the interbank market on the days of those transactions.  (*See also* ¶ 47

(noting a "clear spike" towards the worst FX rate).)  Moreover, it had investment managers

determining on a daily basis whether the rates BNY Mellon was offering were reasonable, and

presumably reviewing those transactions after they were executed.  SEPTA therefore cannot

credibly maintain that it is entitled to equitable tolling of the statutes of limitations.

## V.

### PLAINTIFF HAS FAILED TO STATE A CLAIM AGAINST DEFENDANT BNY MELLON CORP.

      SEPTA improperly asserts a single claim, unjust enrichment, against Defendant

BNY Mellon Corp.  (Compl., Count II.)  BNY Mellon Corp. is BNY Mellon's corporate parent

and is not alleged to have provided any services to SEPTA.  Indeed, the Complaint lacks any

allegations pertaining to BNY Mellon Corp. other than the identification of it as a party (¶ 13),

its parent relationship to BNY Mellon and Mellon (¶¶ 14-15), and a reference to information

about BNY Mellon in BNY Mellon Corp.'s 10-K filings (¶ 22).  The Complaint clearly fails to

allege sufficient factual allegations to satisfy any of the elements of a cause of action for unjust

enrichment directly against BNY Mellon Corp.

   The Complaint also fails to allege sufficient factual allegations to hold BNY

Mellon Corp. liable for the acts of its alleged subsidiaries, BNY Mellon and Mellon.  There is "a

strong presumption in Pennsylvania against piercing the corporate veil."  *Lumax Indus., Inc.* v.

*Aultman*, 669 A.2d 893, 895 (Pa. 1995).  Courts will only pierce the corporate veil where the

corporate owner uses the corporate entity as a facade for his own personal affairs (the *alter ego*

theory) or "where two or more corporations share common ownership and are, in reality,

operating as a corporate combine" (the *enterprise entity* theory).  *Miners, Inc.* v. *Alpine Equip.*

*Corp.*, 722 A.2d 691, 695 (Pa. Super. Ct. 1998); *see also Fletcher-Harlee Corp.* v. *Szymanski*,

936 A.2d 87, 95-96 (Pa. Super. Ct. 2007).  The Complaint's lone allegation that "[t]here is

substantial overlap between BNY Mellon and BNY Mellon's leadership" (¶ 14) fails to meet

either of these standards for BNY Mellon, and there are no factual allegations to support BNY

Mellon Corp.'s liability for any acts by Mellon.  The Complaint should therefore be dismissed as

to BNY Mellon Corp. for this independent, additional reason.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be granted and the Complaint dismissed in its entirety, with prejudice.  Defendants respectfully request oral argument of this motion.

July 8, 2011                              Respectfully submitted,

                                          /s/Richard L. Scheff
                                          Richard L. Scheff
                                          Peter Breslauer
                                          MONTGOMERY, McCRACKEN, WALKER &
                                          RHOADS, LLP
                                          123 South Broad Street, 24th Floor
                                          Philadelphia, PA 19109
                                          Tel:     (215) 772-1500
                                          Fax:    (215) 772-7620
                                          rscheff@mmwr.com
                                          pbreslauer@mmwr.com

                                          Charles E. Davidow (*Admitted Pro Hac Vice*)
                                          PAUL, WEISS, RIFKIND, WHARTON &
                                          GARRISON LLP
                                          2001 K Street, N.W.
                                          Washington, DC  20006-1047
                                          Tel.  (202) 223-7300
                                          Fax  (202) 223-7420
                                          cdavidow@paulweiss.com

                                          Michele Hirshman (*Admitted Pro Hac Vice*)
                                          James J. Brennan (*Admitted Pro Hac Vice*)
                                          PAUL, WEISS, RIFKIND, WHARTON &
                                          GARRISON LLP
                                          1285 Avenue of the Americas
                                          New York, NY  10019 6064
                                          Tel.  (212) 373-3000
                                          Fax  (212) 757-3990
                                          mhirshman@paulweiss.com
                                          jbrennan@paulweiss.com

                                          *Attorneys for Defendants*