**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY, individually and on behalf of all others similarly situated, | CIVIL ACTION NO. 11-cv-01628 (JHS) |
| Plaintiffs, | |
| v. | |
| THE BANK OF NEW YORK MELLON CORPORATION, MELLON BANK N.A., THE BANK OF NEW YORK MELLON, | |
| Defendants. | |

**PLAINTIFF SOUTHEASTERN PENNSYLVANIA
TRANSPORTATION AUTHORITY'S OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................1

II.   FACTUAL BACKGROUND ...........................................................................6

      A.    BNY Mellon is a Fiduciary For SEPTA and the Class ...........................6

      B.    BNY Mellon Manipulates FX Rates ........................................................8

      C.    BNY Mellon Actively Conceals Its Unlawful Conduct .......................10

      D.    BNY Mellon Admits to Manipulating FX Rates and Becomes the Target
            of a SEC Probe ......................................................................................11

III.  ARGUMENT ...................................................................................................12

      A.    The Standard on a Motion to Dismiss ...................................................12

      B.    Defendants' Motion to Dismiss Should be Denied ...............................14

            1.    SEPTA Has Adequately Pled a Claim for Breach of Fiduciary
                  Duty .............................................................................................14

                  a.    The MTA Evidences BNY Mellon's Status as a Trustee .............15

                  b.    The Appointment of Investment Managers Does Not
                        Absolve BNY Mellon From All Fiduciary Responsibilities .........21

                  c.    BNY Mellon's Self-Dealing is Presumptively Void ....................23

                  d.    Beneficiaries Justifiably Reposed Trust in BNY Mellon .............24

                  e.    The "Gist of the Action" Doctrine Does Not Preclude
                        SEPTA's Breach of Fiduciary Duty Claim .................................27

            2.    SEPTA Properly Alleges a Breach of Contract Claim Premised on
                  BNY Mellon's Obligation to Provide "Best Execution" Pricing for
                  FX Trades .....................................................................................30

                  a.    The FX Procedures Form and the FX Policies and
                        Procedures Do Not Include a Merger Clause ...............................31

                  b.    The FX Procedures Form and the FX Policies and
                        Procedures Are Ambiguous .........................................................34

            3.    SEPTA Properly Alleges a Breach of Contract Claim Premised on
                  the Implied Covenant of Good Faith and Fair Dealing .............................35

            4.    SEPTA Properly Alleges an Unjust Enrichment Claim Against All
                  Defendants ...................................................................................38

                  a.    SEPTA May Plead Breach of Contract and Unjust
                        Enrichment as Claims in the Alternative ......................................39

                  b.    BNY Mellon Corp. Can Be Liable for Unjust Enrichment ...........40

            5.    SEPTA's Claims Are Timely ..................................................................41

i

6.  Defendants Have Not Provided Any Basis to Strike References to THE WALL STREET JOURNAL Articles......................................................45

IV. CONCLUSION ..............................................................................................47

# TABLE OF AUTHORITIES

**Cases**                                                                                  **Page(s)**

*Allstate Transp. Co. v. SEPTA*,
   Civ. A. No. 97-1482, 2000 WL 329015 (E.D. Pa. Mar. 27, 2000) .........................37

*Alpart v. Gen. Land Ptnrs., Inc.*,
   574 F. Supp. 2d 491 (E.D. Pa. 2008) ..................................................................40

*Am. Stores Props., Inc. v. Spotts, Stevens & McCoy, Inc.*,
   651 F. Supp. 2d 349 (E.D. Pa. 2009) ..................................................................30

*AMG Nat'l Trust Bank v. Ries*,
   Civ. A. Nos. 06–CV–4337, *et al.*, 2011 WL 3099629 (E.D. Pa. Jul. 22, 2011)......................11

*Anserphone, Inc. v. Bell Atl. Corp.*,
   955 F. Supp. 418 (W.D. Pa. 1996) .....................................................................45

*Arizona State Carpenters Pension Trust Fund v. Citibank (Ariz.)*,
   125 F.3d 715 (9th Cir. 1997) ...........................................................................27

*Ashcroft v. Iqbal*,
   129 S.Ct. 1937 (2009) .............................................................................12, 13

*Axis Specialty Ins. Co. v. The Brickman Group, Ltd., LLC*,
   Civ. A. No. 09-3499, 2010 WL 376784 (E.D. Pa. Jan. 28, 2010)..........................39

*Baker v. Family Credit Counseling Corp.*,
   440 F. Supp. 2d 392 (E.D. Pa. 2006) ............................................................40, 41

*Basile v. H & R Block, Inc.*,
   11 A.3d 992 (Pa. Super. 2010) ..........................................................................25

*Beauty Time, Inc. v. VU Skin Sys., Inc.*,
   118 F.3d 140 (3d Cir. 1997) .........................................................................43, 44

*Beddall v. State St. Bank and Trust Co.*,
   137 F.3d 12 (1st Cir. 1998).............................................................................26

*Bedrock Stone & Stuff, Inc. v. Mfrs. & Traders Trust Co.*,
   Civ. A. No. 04-02101, 2005 WL 1279148 (E.D. Pa. May 25, 2005)..............................36, 38

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ...............................................................................12, 13

*Benak v. Alliance Capital Mgmt. L.P.*,
    349 F. Supp. 2d 882 (D.N.J. 2004)............................................................46

*Bixler v. Central Pa. Teamsters Health & Welfare Fund*,
    12 F.3d 1292 (3d Cir. 1993) ....................................................................23

*Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc.*,
    247 F.3d 79 (3d Cir. 2001) ...............................................................*passim*

*Brown & Brown, Inc. v. Cola*,
    745 F. Supp. 2d 588 (E.D. Pa. 2010).......................................................29

*Busy Bee, Inc. v. Wachovia Bank, N.A.*,
    No. 97 CV 5078, 2006 WL 723487 (Pa. Com. Pl. Feb. 28, 2006)........................25

*Carpenters Combined Funds v. Klingman*,
    No. 10-cv-63-TFM, 2010 WL 1007830 (W.D. Pa. Mar. 15, 2010) ....................13

*CDL Med. Tech, Inc. v. Malik*,
    No. 10-cv-821, 2011 WL 487605 (W.D. Pa. Feb. 7, 2011) ...................................39

*Cohen, Seglias, Greenhall, Pallas, & Furman, P.C. v. Hessert Constr.*,
    Civ. A. No. 10-6183, 2011 WL 382571 (E.D. Pa. Feb. 4, 2011) ...........................39

*Coldwell Banker Commercial/Feist v. BEF Corp.*,
    No. 2007-C-1707, 2007 WL 5023233 (Pa. Com. Pl. Dec. 26, 2007) ....................26

*Cole v. Lawrence*,
    701 A.2d 987 (Pa. Super. 1997) ..............................................................45

*Coleman v. Commonwealth Land Title Ins. Co.*,
    684 F. Supp. 2d 595 (E.D. Pa. 2010).......................................................39

*Compania Sud-Americana de Vapores, S.A. v. IBJ Schroder Bank & Trust Co.*,
    785 F. Supp. 411 (S.D.N.Y. 1992) .........................................................26

*Devon IT, Inc. v. IBM Corp.*,
    Civ. A. No. 10-2899, 2011 WL 1331888 (E.D. Pa. Mar. 31, 2011) ....................26

*Donahue v. Federal Express Corp.*,
    753 A.2d 238 (Pa. Super. 2000) ..............................................................35

*Edmonson v. Lincoln Nat'l. Life Ins. Co.*,
    Civ. A. No. 10–4919, 2011 WL 1234889 (E.D. Pa. Apr. 1, 2011) .................*passim*

*In re Estate of Evasew*,
    584 A.2d 910 (Pa. 1990)..........................................................22, 24, 27, 30

*eToll, Inc. v. Elias/Savion Advertising, Inc.*,
    811 A.2d 10 (Pa. Super. 2002) ........................................................................26

*In re Federated Mut. Funds Excessive Fee Litig.*,
    No. 04-cv-352, 2009 WL 5821045 (W.D. Pa. Sept. 30, 2009) ..............................4, 13, 17, 21

*Fin. Software Sys., Inc. v. Lecocq*,
    Civ. A. No. 07-3034, 2008 WL 2221903 (E.D. Pa. May 27, 2008)........................................45

*Frowen v. Blank*,
    425 A.2d 412 (Pa. 1981).......................................................................................25

*Glaziers and Glassworkers Union Local No. 252 Annuity Fund v. Newbridge Sec. Inc.*,
    93 F.3d 1171 (3d Cir. 1996) ...................................................................20, 23, 29, 30

*Gonzalez v. Old Kent Mortgage Co.*,
    Civ. A. No. 99-5959, 2000 WL 1469313 (E.D. Pa. Sept. 21, 2000) ....................................39

*Graboff v. The Collern Firm*,
    Civ. A. No. 10-1710, 2010 WL 4456923 (E.D. Pa. Nov. 8, 2010) ................................*passim*

*Gurfein v. Sovereign Group*,
    826 F. Supp. 890 (E.D. Pa. 1993) .........................................................................44

*Hill v. State Street Corp.*,
    No. 09-cv-12146, 2011 WL 3420439 (D. Mass. Aug. 3, 2011).....................................*passim*

*Howe v. LC Philly, LLC*,
    Civ. No. 10–5495, 2011 WL 1465446 (E.D. Pa. Apr. 15, 2011) ....................................*passim*

*Hutchison v. Sunbeam Coal Corp.*,
    519 A.2d 385 (Pa. 1986).......................................................................................37

*Interactive Intelligence, Inc. v. KeyCorp*,
    546 F.3d 897 (7th Cir. 2008) ................................................................................26

*Interwave Tech., Inc. v. Rockwell Automation, Inc.*,
    Civ. A. No. 05-398, 2005 WL 3605272 (E.D. Pa. Dec. 30, 2005)...................................28, 30

*Kahan Novoa v. Safra Nat'l. Bank of New York*,
    313 F. Supp. 2d 1347 (S.D. Fla. 2003).....................................................................26

*Kamco Indus. Sales, Inc. v. Lovejoy, Inc.*,
    Civ. A. No. 09-1407, 2011 WL 891825 (E.D. Pa. Mar. 10, 2011) .............................36, 37, 38

*King v. Baldino*,
    648 F. Supp. 2d 609 (D. Del. 2009) ........................................................................46

*Laufen Int'l, Inc. v. Larry J. Lint Floor & Wall Covering, Co., Inc.*,
No. 10-cv-199, 2010 WL 1714032 (W.D. Pa. Apr. 27, 2010) ...............................................29

*Lenzi v. Hahnemann Univ.*,
664 A.2d 1375 (Pa. Super. 1995) ........................................................................................31

*Levine v. First Am. Title Ins. Co.*,
682 F. Supp. 2d 442 (E.D. Pa. 2010).............................................................................3, 5, 39

*Levinson v. PSCC Servs., Inc.*,
No. 09–0269, 2010 WL 5477250 (D. Conn. Dec. 29, 2010) ..........................................16, 22

*Lewis v. Delp Family Powder Coatings, Inc.*,
Civ. A. No. 08–1365, 2011 WL 1230207 (W.D. Pa. Mar. 31, 2011) .....................................30

*In re Loewen Group Inc. Secs. Litig.*,
Civ. A. No. 98-6740, 2004 WL 1853137 (E.D. Pa. Aug. 18, 2004) .....................................46

*In re Lucent Techs., Inc. Sec. Litig.*,
217 F. Supp. 2d 529 (D.N.J. 2002).......................................................................................46

*Lum v. Bank of Am.*,
361 F.3d 217 (3d Cir. 2004) ................................................................................................46

*Martin v. Ford Motor Co.*,
765 F. Supp. 2d. 673 (E.D. Pa. 2011)........................................................................41, 42, 43

*Mascarini v. Quality Emp't Servs & Training*,
No. 10-CV-1546, 2011 WL 332425 (M.D. Pa. Jan. 31, 2011) ............................................13

*McHale v. NuEnergy Group*,
Civ. A. No. 01-4111, 2002 WL 321797 (E.D. Pa. Feb. 27, 2002) .......................................35

*Melley v. Pioneer Bank, N.A.*,
834 A.2d 1191 (Pa. Super. 2003) ........................................................................................43

*In re Mexico Money Transfer Litig.*,
267 F.3d 743 (7th Cir. 2001)...............................................................................................26

*Monarch Life Ins. Co. v. Estate of Tarone*,
Civ. A. No. 09-734, 2010 WL 331703 (E.D. Pa. Jan. 26, 2010)..........................30, 34, 35, 46

*Murphy v. Duquesne Univ. Of the Holy Ghost*,
777 A.2d 418 (Pa. 2001).....................................................................................................32

*In re Mushroom Transp. Co., Inc.*
382 F.3d 325 (3d Cir. 2004) .................................................................................27, 43, 44, 45

*Northview Motors, Inc. v. Chrysler Motors Corp.*,
    227 F.3d 78 (3d Cir. 2000) ............................................................................ 37

*Ohio Cas. Ins. Co. v. LRS Constr., Inc.*,
    Civ. A. No. 07-MC-331, 2008 WL 4533677 (W.D. Pa. Oct. 3, 2008) .................... 31

*Packer Soc'y. Hill Travel Agency, Inc. v. Presby. Univ.*,
    635 A.2d 649 (Pa. Super. 1993) .................................................................... 45

*Pegram v. Herdrich*,
    530 U.S. 211 (2000) ...................................................................................... 28

*Performance HR, Ltd., Inc. v. Archway Ins. Servs. LLC*,
    Civ. A. No. 08-3432, 2008 WL 4739381 (E.D. Pa. Oct. 23, 2008) ...................... 28

*PPG Indus., Inc. v. Generon IGS, Inc.*,
    760 F. Supp. 2d 520 (W.D. Pa. 2011) ............................................................ 39

*Robinson v. Johnson*,
    313 F.3d 128 (3d Cir. 2002) ......................................................................... 41

*Rubin Quinn Moss Heaney & Patterson, P.C. v. Kennel*,
    832 F. Supp. 922 (E.D. Pa. 1993) ................................................................. 44

*Santiago v. Warminster Twp.*,
    629 F.3d 121 (3d Cir. 2010) ..................................................................... 12, 13

*Schwartz v. Lawyers Title Ins. Co.*,
    680 F. Supp. 2d 690 (E.D. Pa. 2010) ............................................................ 39

*Somers v. Somers*,
    613 A.2d 1211 (Pa. Super. 1992) .................................................................. 36

*Srein v. Frankford Trust Co.*,
    323 F.3d 214 (3d Cir. 2003) ......................................................................... 27

*State of California v. State St. Corp.*,
    No. 34-2008-00008457-CU-MC-GDS, slip. op. (Cal. Super. Mar. 30, 2011) ............*passim*

*Sun Co., Inc. (R&M) v. Pa. Turnpike Comm'n*,
    708 A.2d 875 (Pa. Cmwlth. 1998) ................................................................. 19

*Temple Univ. Hosp., Inc. v. Group Health, Inc.*,
    Civ. A. No. 05-102, 2006 WL 146426 (E.D. Pa. Jan. 12, 2006) ......................... 37

*Thompson v. Glenmede Trust Co.*,
    Civ. A. No. 92-5233, 1994 WL 683378 (E.D. Pa. Nov. 30, 1994) .......... 14, 15, 20, 21

*U.S. Steel Corp. v. Lumbermens Mut. Cas. Co.*,
　Civ. A. No. 02–2108, 2005 WL 2106580 (W.D. Pa. Aug. 31, 2005) ....................................32

*USX Corp. v. Prime Leasing Inc.*,
　988 F.2d 433 (3d Cir. 1993) .....................................37

*Valley Forge Convention & Visitors Bureau v. Visitor's Servs., Inc.*,
　28 F. Supp. 2d 947 (E.D. Pa. 1998).....................................26

*Wulf v. Bank of Am., N.A.*,
　Civ. A. No. 10-5176, 2011 U.S. Dist. LEXIS 71906 (E.D. Pa. Apr. 15, 2011) ....................38

*Zaloga v. Provident Life and Acc. Ins. Co. of Am.*,
　671 F. Supp. 2d 623 (M.D. Pa. 2009).....................................13, 35, 37, 38

*Zeno v. Ford Motor Co., Inc.*,
　480 F. Supp. 2d 825 (W.D. Pa. 2007) .....................................*passim*

## RULES

FED. R. CIV. P. 8 .....................................*passim*

FED. R. CIV. P. 9 .....................................34

FED. R. CIV. P. 12 .....................................*passim*

FED. R. CIV. P. 15(a) .....................................47

FED. R. CIV. P. 56 .....................................4, 13, 20

## STATUTES

29 U.S.C. §1110 .....................................21

Plaintiff Southeastern Pennsylvania Transportation Authority ("SEPTA") respectfully submits this opposition to the memorandum of law submitted by Defendants, The Bank of New York Mellon Corp. ("BNY Mellon Corp."), Mellon Bank N.A. ("Mellon") and The Bank of New York Mellon ("BNY Mellon" or the "Company"), in support of their motion to dismiss the Second Amended Class Action Complaint (the "Complaint").[1]  Plaintiff requests oral argument on Defendants' motion.

## I.  INTRODUCTION

BNY Mellon, a trustee, concedes that it owes the Class fiduciary obligations.  *See* Def. Br. at 25.[2]  Notwithstanding this concession, for at least the past decade, BNY Mellon has systematically raided the accounts of beneficiaries, such as SEPTA, to generate hundreds of millions of dollars in illicit arbitraged profits for itself and its corporate parent, BNY Mellon Corp.  The scheme entailed BNY Mellon charging beneficiaries fabricated foreign exchange ("FX") rates when trading currencies on their behalf.[3]

BNY Mellon's scheme depended on two factors:  (1) beneficiaries, already relying on BNY Mellon to act as a fiduciary to safeguard their assets, believing that FX trading would be executed under their trust agreements; and (2) BNY Mellon creating the perception that FX trades would be priced at the market (or the Interbank) rate when the trade was executed.  Both factors operated in harmony until early 2011 when two state attorneys general unsealed separate *qui tam* actions in Florida and Virginia against BNY Mellon.  The *qui tam* actions – for the first time – shed light on BNY Mellon's rigged FX trading operations, which charged clients

---

[1]      References to BNY Mellon or the Company include Mellon.

[2]      "Def. Br." refers to Docket ("Dkt.") No. 40-1.  Unless otherwise noted, all citations in the form "¶ _" are to the Complaint (Dkt. No. 32). Unless otherwise noted, all emphases are added and all internal citations are omitted.

[3]      Unless otherwise noted, all references to FX trading are to "indirect" trading or trading based on "standing instructions."  "Direct" or "negotiated" trading is not a basis of SEPTA's claims.  *See* ¶ 27.

fabricated post-trade FX rates that had nothing to do with prevailing market rates or the "best execution" pricing BNY Mellon promised to apply to its fiduciary clients' FX trades. The process was rigged by Defendants to ensure that beneficiaries bore all risks associated with the FX price movements while Defendants enjoyed all of the gains.

On March 7, 2011, SEPTA filed an initial class action complaint against BNY Mellon Corp. Thereafter, other BNY Mellon beneficiaries came forward to disclose that they too were victims of BNY Mellon's practices. The federal government has now joined these investigations as the Securities and Exchange Commission ("SEC") has an ongoing probe into BNY Mellon's disclosures regarding its FX practices – the very disclosures at issue in this case.

In May 2011, weeks after SEPTA's initial lawsuit was filed, BNY Mellon tacitly admitted the inadequacy of its Class Period[4] representations by issuing a statement explaining that: the Company purportedly was not acting as a fiduciary when trading FX for custodial clients; its indirect FX services were purportedly offered "outside" of its custodial agreements; and the Company "tend[s] to purchase currencies" for its "clients towards the low end of the interbank range and sell towards the high end. . . ." ¶¶ 49-51. The post-Class Period admissions, however, were disclosed far too late for beneficiaries like SEPTA who had already been bilked out of millions of dollars in illicit fees by Defendants through the application of fictitious FX rates.

Notwithstanding the mushrooming number of investigations underway by state and federal authorities and by the Company's beneficiaries,[5] BNY Mellon's recent admissions, and

---

[4]    *See* ¶ 4 (defining the Class Period as between 2000 and continuing through May 2, 2011).

[5]    In addition to the investigations indentified in the Complaint, on June 13, 2011, the Pension Reserves Investment Management Board for the Commonwealth of Massachusetts ("Mass PRIM"), released an analysis of FX trading conducted by BNY Mellon between 2007 and 2011. *See* Exhibit ("Ex.") A to the Declaration of Joseph H. Meltzer in Support of Plaintiff Southeastern Pennsylvania Transportation Authority's Opposition To Defendants' Motion To Dismiss the Second Amended Class Action Complaint ("Meltzer Decl."). Mass PRIM's analysis

SEPTA's own statistical analysis establishing injuries from BNY Mellon's unlawful conduct – the veracity of which Defendants do not dispute – Defendants argue the Complaint fails even to **state** a claim and is subject to dismissal under Rule 12(b)(6). Defendants' motion, however, is based on rewriting the Complaint's allegations, offering Defendants' own account of events, and in some cases simply ignoring SEPTA's allegations altogether – none of which is appropriate when seeking dismissal under Rule 12. *See Howe v. LC Philly, LLC*, Civ. A. No. 10–5495, 2011 WL 1465446, at *1-2 (E.D. Pa. Apr. 15, 2011) (Slomsky, J.).

The Complaint pleads cognizable claims for breach of fiduciary duty, unjust enrichment and breach of contract.[6] Defendants have moved to dismiss each claim on a number of theories, none of which have merit. Defendants' motion to dismiss should be denied for the following reasons.

*First*, SEPTA's fiduciary agreements with BNY Mellon contemplate that FX trades would be executed within the scope of the parties' fiduciary relationship. To the extent that the relevant documents are in any way ambiguous, Pennsylvania law places the burden on BNY Mellon to justify the appropriateness of self-dealing transactions that disadvantage beneficiaries such as SEPTA. *See Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 101 (3d Cir. 2001) ("Pennsylvania law shifts the burden onto fiduciaries to prove the fairness of a self-benefitting transaction"). In a virtually identical case against State Street Corp. brought by two California pension funds, the court rejected the bank's argument that the case should be

---

concluded that it was overcharged by approximately $20 million as a result of the Company's unlawful FX trading practices. *See id.* at p. 5. Based on its initial findings, Mass PRIM announced that it will extend its audit back to January 1, 2000 and will be working with Massachusetts Attorney General's Office "to explore all legal options with respect to excess costs of non-negotiated foreign exchange transactions executed with BNY Mellon." *Id.* at p. 11.

[6] The claims are pleaded in the alternative, which the Federal Rules of Civil Procedure expressly allow. *See* Fed. R. Civ. P. 8(d)(2) ("If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient").

dismissed because the disputed FX trading was purportedly conducted outside of its fiduciary responsibilities. *See State of California v. State St. Corp.,* No. 34-2008-00008457-CU-MC-GDS, slip. op. at 2 (Cal. Super. Mar. 30, 2011) ("*State Street*") ("whether [custodial banks] are fiduciaries for some transactions and not for others cannot be determined on demurrer");[7] *see also Hill v. State Street Corp.*, No. 09-cv-12146, 2011 WL 3420439, at *14 (D. Mass. Aug. 3, 2011) ("*Hill*") ("Plaintiffs have offered sufficient, particularized facts to support a reasonable inference that State Street defrauded its clients through its FX practice"). The same result is appropriate here.

*Second*, BNY Mellon's argument that its use of the term "best execution" on its website is irrelevant promotional material that does not relate to pricing is meritless. As an initial matter, this argument is simply a contradiction of SEPTA's allegations, which is inappropriate on a motion to dismiss. Moreover, in addition to pleading that BNY Mellon would provide "best execution" pricing, the Complaint also pleads that BNY Mellon assured beneficiaries that FX trades would be "free of charge." In any event, courts within this Circuit have held that determining the scope of a contract is a question of fact that cannot be resolved on motions for summary judgment under Rule 56 – let alone on a motion to dismiss. *See Zeno v. Ford Motor Co., Inc.*, 480 F. Supp. 2d 825, 848-49 (W.D. Pa. 2007) (marketing material may be sufficient to create contractual obligations); *In re Federated Mut. Funds Excessive Fee Litig.*, No. 04-cv-352, 2009 WL 5821045, at *3 (W.D. Pa. Sept. 30, 2009) (recent Supreme Court authority did not convert the standard for assessing motions to dismiss into the standard for assessing motions for summary judgment).

---

[7] Meltzer Decl., at Ex. B.

4

*Third*, Defendants' argument that SEPTA's unjust enrichment claim must be dismissed is erroneous. Courts routinely allow unjust enrichment claims to be pled alternatively. *See Levine v. First Am. Title Ins. Co.*, 682 F. Supp. 2d 442, 468-69 (E.D. Pa. 2010) (Slomsky, J.) ("the Court will permit Plaintiffs to plead unjust enrichment in the alternative"). This logic is particularly fitting here given that Defendants dispute whether certain terms (*e.g.*, "best execution") are part of any contractual obligations owed to the Class and claim that BNY Mellon Corp. provided no services to SEPTA. *See* Def. Br. at 3, 33-34.

*Finally*, notwithstanding Defendants' arguments to the contrary, all of SEPTA's claims are timely. The Complaint alleges that BNY Mellon actively concealed its conduct and took steps to create the appearance that trades were executed within daily FX ranges. Defendants' argument that SEPTA's claims are barred because it purportedly could have prepared a statistical analysis of FX trades at any time is absurd. SEPTA was under no obligation to retain experts to conduct a complex statistical analysis of its trading to ensure that its fiduciary was not breaching its duties and embezzling funds. Indeed, the hallmark of a fiduciary relationship is that a beneficiary like SEPTA places its faith and trust in its fiduciary, which is duty-bound to place SEPTA's interests before its own. Notably, neither the SEC nor state attorneys general began looking into BNY Mellon's FX practices until the scheme was disclosed by whistleblowers with personal knowledge of BNY Mellon's practices. Moreover, Defendants' timeliness argument is not properly raised through a motion to dismiss under Rule 12.

Stripped to its core, BNY Mellon's motion to dismiss seeks dismissal after redrafting SEPTA's allegations and offering its own version of events. This is plainly improper at this stage of the litigation. For the reasons set forth below, Defendants' motion to dismiss should be denied in its entirety.

## II.     FACTUAL BACKGROUND

### A.     BNY Mellon is a Fiduciary For SEPTA and the Class

BNY Mellon and its corporate predecessors have served as SEPTA's trustee and fiduciary for over two decades.  ¶¶ 1, 2, 17.  The parties entered into a fiduciary relationship through a Master Trust Agreement ("MTA"), effective January 1, 1990, in which BNY Mellon agreed to act as a trustee for a master trust created to hold SEPTA's assets in order to fund and pay benefits under employee pension benefit plans.  ¶ 17.[8]

Under Section 12 of the MTA, BNY Mellon expressly acknowledges "that it assumes the fiduciary duties established by this Agreement."  MTA §12.  The MTA, however, looks to common law to define the scope of BNY Mellon's fiduciary obligations.  *See* MTA §5.2 (discussing limitation of responsibilities and liabilities "***normally or statutorily incident to a trustee***"); *id.* §2.5 (the Master Trust shall be held in accordance with "***applicable law***"); *id.* §2.6 ("***[e]xcept as may be permitted by law*. . . .**").

BNY Mellon's responsibilities as a trustee to SEPTA and the Class include, among other things, the execution of FX trades.  ¶ 3.  Executing such trades requires BNY Mellon to convert U.S. dollars into foreign currency and vice versa.  ¶ 21.  BNY Mellon executed FX transactions on behalf of its clients in two separate forms:  "direct" trading and "indirect" trading.  ¶¶ 24-26.  Only "indirect trading" or trading based on "standing instructions" is implicated by SEPTA's action.  *See* ¶ 27.  Indirect trading, unlike "direct trading," involves the trustee (BNY Mellon) executing the trade without any input from the beneficiary and the trustee controlling all information relating to the trade, including timing and pricing.  *See* ¶¶ 26, 44.  During the Class Period, BNY Mellon represented that indirect trading was a ***"free of charge"*** service to

---

[8]      The MTA and the First Amendment to the MTA ("Amended MTA") are attached to the Complaint as Exhibits A and B, respectively.

beneficiaries that was subject to ***"best execution"*** pricing that would permit beneficiaries to

***"concentrate on their core businesses."*** *See* ¶¶ 26-29. Each of these representations was false.

Current information relating to BNY Mellon's indirect FX trading program is located in

several sources, including:

- a one-page "check the box" FX procedure form provided by BNY Mellon to beneficiaries and their investment managers (the "FX Procedure Form") (¶¶ 31-32);

- a hyperlink referenced in the FX Procedure Form to a BNY Mellon website that posts a daily range of FX prices (the "FX Website") (¶¶ 32-35);

- a document accessible through the FX Website that provides information about BNY Mellon's indirect FX trading program (the "FX Policies and Procedures") (¶¶ 32-34); and

- a document accessible through the FX Website that provides details concerning BNY Mellon's indirect FX trading program, including assurances to clients that indirect trades are subject to "best execution" practices (the "Standing Instructions Page") (¶¶ 29, 32-33, 35-37).[9]

Of the foregoing documents, BNY Mellon requires beneficiaries (or their investment

managers) to sign only the one-page FX Procedure Form to participate in its indirect trading

program. ¶ 31. The FX Procedure Form, which resembles an administrative form, is itself a

non-remarkable boilerplate form that does not discuss or disclose: any limitation of fiduciary

obligations; that BNY Mellon will conduct FX trading "outside" of the parties' trust agreements;

or that BNY Mellon will engage in self-dealing by charging fictitious FX rates. *See* ¶ 32; *see*

*also* Def. Decl., at Exs. 1-4. Nothing about the FX Procedure Form, the FX Policies and

Procedures, or the Standing Instructions Page, individually or collectively, modifies or limits the

duties and obligations BNY Mellon owed to SEPTA and the Class. ¶ 38.

---

[9]     *See also* ¶¶ 26, 28-29, 53 (discussing BNY Mellon's obligation to apply "best execution" pricing to indirect FX trades); Ex. 9 to the Declaration of James J. Brennan in Support of Defendants' Motion to Dismiss the Second Amended Complaint, dated Jul. 8, 2011 (Dkt. No. 40-3) ("Def. Decl.") (attaching the Standing Instructions Page).

Consistent with BNY Mellon's assurances, throughout the Class Period, SEPTA and the Class justifiably trusted and relied upon BNY Mellon to comply with its fiduciary obligations and to execute FX transactions using "best execution" standards, which required BNY Mellon to extend every effort to obtain the best prices for its clients. ¶¶ 26, 28-29, 35-39, 53. SEPTA's claim that BNY Mellon was required to apply "best execution" pricing is consistent with the views of other beneficiaries of BNY Mellon. *See* ¶ 53.

### B. BNY Mellon Manipulates FX Rates

Despite its role as a fiduciary and promise to use "best execution" when making indirect FX trades (which were also represented to be "free of charge"), two unsealed *qui tam* actions being investigated by the Florida and Virginia attorneys general provide specific details about how BNY Mellon secretly manipulated FX transactions throughout the Class Period, allowing it to generate hundreds of millions of dollars in unlawful trading revenue at the expense of its beneficiaries, like SEPTA and the Class. ¶¶ 4, 22, 39. According to the attorneys general's actions, BNY Mellon was able to extract these illicit and unjust profits by assigning clients' FX trades a fabricated exchange rate that was unrelated to the rate paid by the Company or the prevailing market rate (*i.e.*, the Interbank rate) at the time the trade was executed. ¶ 40. Rather than charging clients the prevailing FX rate at the time of the actual transaction, BNY Mellon observed post-trade movements in the FX market rates and charged beneficiaries as if the trade had occurred at either the high or low of the day, depending on whether the transaction was a purchase or a sale. ¶¶ 40-41. Through this method, the Company pocketed the difference between the price actually paid for the currency, or the market rate at the time the FX trade was executed, and the amount ultimately debited or credited to beneficiaries' accounts. ¶ 42. Stated differently, BNY Mellon would create the FX rate *after* a trade was executed in an effort to maximize its own secret profits. ¶ 42.

On August 11, 2011, the Virginia Attorney General filed a complaint in intervention in *Commonwealth of Virginia, ex rel. FX Analytics v. The Bank of New York Mellon Corp.*, Civ. No. CL-2009-15377 (Va. Cir.) that included additional details about BNY Mellon's scheme.[10] The Virginia AG Complaint details, among other things:

- BNY Mellon removing representations from its website stating that FX trades would be "free of charge" sometime in October 2009 following the unsealing of the California Attorney General's action against State Street. *See* Virginia AG Compl., ¶¶ 80, 169-70;

- Internal emails where BNY Mellon executives discuss the profit potential to BNY Mellon when clients are not provided full information about indirect FX pricing. *Id.*, ¶¶ 118-21; and

- Internal emails where BNY Mellon executives boast about BNY Mellon's ability to maintain spreads on FX trades by being "'late' to the transparency space." *Id.*, ¶ 121.

SEPTA and the Class are victims of BNY Mellon's unlawful scheme. *See* ¶ 46. The Complaint includes a statistical analysis of a sample of SEPTA's indirect FX transactions executed by BNY Mellon. *Id.* The analysis shows that 17% of the sample transactions were priced at the ***absolute worst*** FX rate for the sample period and ***more than two-thirds*** of the sample trades were priced below the median FX rate for any given day. *Id.* As detailed by THE WALL STREET JOURNAL, an analysis of trades executed by BNY Mellon for another client, the Los Angeles County Employees Retirement Association ("LACERA"), demonstrates a similar pattern. *See* ¶¶ 43, 53. Notably, BNY Mellon has not challenged the veracity of SEPTA's analysis and has "confirmed the accuracy" of THE WALL STREET JOURNAL'S analysis. *See* ¶ 53. SEPTA's and LACERA's independent analyses of their trading corroborate the theory prosecuted by the Florida and Virginia Attorneys General. ¶ 48.

---

[10]     *See* Meltzer Decl., Ex. C ("Virginia AG Complaint"); *see also* Compl., at n.1 (relying on pleadings in *Commonwealth of Virginia*, Civ. No. CL-2009-15377).

SEPTA and the Class relied on BNY Mellon to execute FX trades honestly, to accurately report the applicable FX rates for transactions, and to carry out trades in a manner consistent with its fiduciary obligations and other written representations, including its assurances to utilize "best execution" standards and that FX trades would be "free of charge." ¶¶ 28, 45, 53; Virginia AG Compl., ¶¶ 169-70. SEPTA's analysis of its trades established that BNY Mellon failed to do any of these things and actively sought to enrich itself through its beneficiaries. *See* ¶¶ 46-48.

### C.     BNY Mellon Actively Conceals Its Unlawful Conduct

Not only did BNY Mellon fail to affirmatively disclose its self-dealing, a fundamental requirement of trustees, but it actively concealed its scheme to evade detection. As detailed in the Complaint, the account statements BNY Mellon provided to its beneficiaries during the Class Period generally reported FX rates that fell within (or close to) the range of each day's FX rates, but failed to provide time stamped execution prices. ¶ 57. By omitting time stamps from reports, the Company prevented beneficiaries from discovering that the FX rates they were being charged were manipulated and bore no relationship to the actual market rate at the time of execution. ¶ 57. Moreover, rather than providing clients account statements that separated FX rates and commissions paid, BNY Mellon bundled the figures into fabricated FX rates. The bundled rates created the illusion that clients were paying only FX rates, whereas the reported numbers actually included FX rates *plus* undisclosed compensation to BNY Mellon. *See* ¶ 28 (representing that FX trades would be "free of charge").

As such, SEPTA and the Class had no way of discovering they were being charged manipulated and fictitious FX rates, that BNY Mellon was taking undisclosed compensation for FX trading, or the amount of BNY Mellon's illicit enrichment. ¶ 57. It was not until the *qui tam* actions in Virginia and Florida were unsealed in early 2011 that SEPTA and the Class became aware of BNY Mellon's misdeeds.

Moreover, the Virginia AG Complaint states that BNY Mellon deleted representations from its website regarding FX trading after the California Attorney General's action against State Street was unsealed.  *See* Virginia AG Compl., ¶170 ("Moreover, after the *California v. State Street* case was announced, ***the language of . . . [BNY Mellon's] webpage was changed***, so that no reference to 'free of charge' standing-instruction FX trading remained.").[11]  Thus, BNY Mellon is actively seeking to prevent Class members from fully analyzing the scope of their claims.

### D. BNY Mellon Admits to Manipulating FX Rates and Becomes the Target of a SEC Probe

On May 2, 2011, after the *qui tam* actions were unsealed and after SEPTA filed its initial Class Action Complaint in this case, BNY Mellon admitted it charged unfavorable FX rates. ¶ 49 (the "FX Corrective Disclosure"); *see also* Def. Decl., at Ex. 10.  Significantly, the FX Corrective Disclosure admitted that BNY Mellon "tend[s] to purchase currencies" for its "clients towards the low end of the interbank range and sell towards the high end. . . ."  ¶ 51.  The FX Corrective Disclosure also stated that:

- "BNY Mellon . . . offers various services that are ancillary to and independent of the basic custodial relationship. Among those ancillary services – which are not provided as part of the custody agreement – are foreign exchange (FX) services, including our 'standing instruction' FX service."

- "Clients and investment managers who elect to use our FX services, including our 'standing instruction' program, receive those services separately from the custodial relationship, and the terms of service are explained in various materials provided to our clients and their investment managers."

- "In all FX transactions executed with our clients, BNY Mellon acts as a 'principal' or 'counterparty,' buying currency from or selling currency to our clients or their investment managers.  We do not enter the FX market to trade on behalf of or for the benefit of clients – as an investment manager would.  Rather,

---

[11]     If these allegations are true, BNY Mellon has presumably implemented protocols to preserve all potentially relevant evidence.  *See AMG Nat'l Trust Bank v. Ries*, Civ. A. Nos. 06–CV–4337, *et al.*, 2011 WL 3099629, at *4 (E.D. Pa. Jul. 22, 2011) (noting duty to preserve evidence) (Joyner, CJ.).

BNY Mellon enters into a transaction directly with the client, taking the currency position into its own trading book where it is aggregated with all of BNY Mellon's other foreign currency positions.  As a result, we assume the risk of price movements in the currency, including possible losses."

- "Because of our role as a principal, the fiduciary obligation and decision-making for these FX transactions – including decisions to participate in the 'standing instruction' program – rests with our clients and their investment managers, and we act only at their direction, as required by our custody agreements.  Of course, there are other parts of BNY Mellon's custody business where we do assume fiduciary responsibility, and we take those fiduciary obligations extremely seriously."

¶ 50.  Critically, this information was *not* provided to SEPTA or the Class during the Class Period.

In addition to the state attorneys generals' actions and BNY Mellon's clients' investigations, the federal government is now examining BNY Mellon's FX trading practices and disclosures.  On May 24, 2011, THE WALL STREET JOURNAL reported that the SEC was launching an investigation into BNY Mellon's disclosure of its FX trading practices to custodial clients, the very same misconduct at issue here.  ¶ 55.

## III.    ARGUMENT

### A.    The Standard on a Motion to Dismiss

"Applying the principles of [*Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009)] and [*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)], the Third Circuit in *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010), set forth a three-part analysis that a district court in this Circuit must conduct in evaluating whether allegations in a complaint survive a 12(b)(6) motion to dismiss."  *Howe*, 2011 WL 1465446, at *1.

First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim."  Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth."  Finally, "where there are well-pleaded factual allegations, *a court should assume their veracity* and then determine whether they plausibly give rise to an entitlement for relief."

*Id.* at *2 (quoting *Santiago*, 629 F.3d 121). The "'plausibility' determination is a 'context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id.*

Motions to dismiss are not vehicles for defendants to present their own iteration of the facts and seek dismissal based on arguments flowing from their version of events. *See Carpenters Combined Funds v. Klingman,* No. 10-cv-63-TFM, 2010 WL 1007830, at *1 (W.D. Pa. Mar. 15, 2010) (Supreme Court "did not abolish" the presumption that allegations in the complaint are read to be true on a Rule 12(b)(6) motion. Indeed, district courts have reiterated that "[w]hen ruling on a motion to dismiss under Rule 12(b)(6), the court must 'accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'" *Mascarini v. Quality Emp't Servs & Training*, No. 10-CV-1546, 2011 WL 332425, at *6 (M.D. Pa. Jan. 31, 2011); *see also Zaloga v. Provident Life and Acc. Ins. Co. of Am.*, 671 F. Supp. 2d 623, 628 (M.D. Pa. 2009) ("The issue in a motion to dismiss is whether the plaintiff should be entitled to offer evidence to support the claim, ***not*** whether the plaintiff will ultimately prevail.").

Here, SEPTA's well pled allegations – which are supported by empirical statistical analysis (¶ 46) and corroborated by a number of BNY Mellon's clients (Compl., at 1 n.1 (citing Virginia and Florida Attorneys General's actions); ¶ 53 (LACERA)) and an ongoing investigation by the SEC (¶ 55) – are more than sufficient to survive Defendants' Rule 12(b)(6) motion. *See Federated*, 2009 WL 5821045, at *3 ("*Twombly* as further clarified in *Iqbal* did not convert the standards governing pleadings under Rule 8 into those governing Rule 56 motions"); *Hill*, 2011 WL 3420439, at *13 (denying motion to dismiss and noting that "[p]laintiffs'

evidentiary sources strengthen one another and collectively paint a plausible picture of a company defrauding its [custodial] clients").

## B. Defendants' Motion to Dismiss Should be Denied

### 1. SEPTA Has Adequately Pled a Claim for Breach of Fiduciary Duty

"The Supreme Court has defined the duty owed by a fiduciary as 'an ***affirmative*** duty of 'utmost good faith, and full and fair disclosure of all material facts,' as well as an ***affirmative*** obligation 'to employ reasonable care to avoid misleading' his clients.' Other courts have held that the duty 'includes ***disclosure of ... all possible conflicts of interest***.'" *Thompson v. Glenmede Trust Co.,* Civ. A. No. 92-5233, 1994 WL 683378, at *3 (E.D. Pa. Nov. 30, 1994) (Hutton, J.). BNY Mellon's self-dealing and inadequate disclosures violate basic fiduciary obligations owed to beneficiaries.

BNY Mellon makes three arguments against SEPTA's fiduciary duty claims. First, Defendants argue BNY Mellon was a fiduciary for some transactions (custodial service) but not others (FX transactions). *See* Def. Br. at 25-26. Second, Defendants argue BNY Mellon's relationship with SEPTA did not create a fiduciary relationship when trading FX. *See id.* at 26-30. Third, Defendants argue SEPTA's fiduciary duty claims are inconsistent with written agreements. *See id.* at 30-32. None of these arguments are sufficient to dismiss the Complaint. *See Thompson,* 1994 WL 683378, at *2 (disputes over the "contours" of fiduciary obligations preclude summary judgment in defendants' favor).[12]

---

[12]     *Cf. Edmonson v. Lincoln Nat'l. Life Ins. Co.*, Civ. A. No. 10–4919, 2011 WL 1234889, at *12 (E.D. Pa. Apr. 1, 2011) ("the Court treats the question of whether Defendant was a fiduciary [under ERISA] as a mixed question of fact and law") (Pollak, J.).

### a.    The MTA Evidences BNY Mellon's Status as a Trustee

BNY Mellon concedes it served as a fiduciary for some transactions during the Class Period, *see* Def. Br. at 25 ("The MTA provided that BNY Mellon assumed certain fiduciary duties"),[13] but argues that any fiduciary duties it owed ceased when it engaged in FX trades. *See* Def. Br. at 26. BNY Mellon's argument is inconsistent with the MTA, conflicts with SEPTA's and other clients' understanding of the scope of the Company's fiduciary obligations (*see* ¶¶ 43, 46, 53, 56), and raises factual questions that are inappropriate for resolution on a motion to dismiss. *See Thompson,* 1994 WL 683378, at *2.

Indirect FX transactions executed by BNY Mellon are a component of its fiduciary obligations under the MTA and BNY Mellon is under an ever-present obligation to protect beneficiaries' assets in its care. *See* ¶¶ 3, 38; *see also* ¶¶ 53, 56. Specifically, Section 8 of the MTA grants BNY Mellon "all discretionary powers not explicitly or implicitly" conferred by the Agreement that are "necessary or proper for the ***protection*** of the property held" by BNY Mellon. ¶ 19 (MTA §8). The amendments to Section 8.1 specifically ***include FX transactions*** as category of transactions BNY Mellon is obligated to protect for SEPTA's benefit. *See id.* Further, Section 10.1 (amended) of the MTA discusses the advancement of funds from BNY Mellon to SEPTA for "***the purchase or sale of foreign exchange***" and "***contracts for foreign exchange***." Amended MTA ¶ 32. Additionally, as BNY Mellon notes, in cases where SEPTA's FX trades are executed by third-parties, SEPTA is required, under the "***Trust and Custody Fee Agreement***," to pay BNY Mellon a $25 fee "as compensation for its role as custodian." *See* Def.

---

[13]    *See also* ¶¶ 18-19; MTA §12.

Br. at 12; *see also* ¶ 20.  Thus, FX trading by BNY Mellon for SEPTA is inextricably intertwined with BNY Mellon's obligations under the MTA.[14]  *See* ¶¶ 18-20.

Despite the MTA's repeated references to FX transactions and BNY Mellon's status as a fiduciary, BNY Mellon argues that the one-page FX Procedure Form – the **only document** BNY Mellon requires clients and their investment managers to sign to make indirect FX trades – and the FX Procedure Form's citation to the FX Website (which hosts the FX Policies and Procedures) collectively sever all fiduciary obligations owed to SEPTA and the Class.  *See* Def. Br. at 26.  Not so.  Fiduciaries are not permitted to casually discard their obligations in such a convoluted manner.  *See Edmonson*, 2011 WL 1234889, at *12 (retaining investment "spread" may breach fiduciary obligations under ERISA).  *Cf. Levinson v. PSCC Servs., Inc.*, No. 09–0269, 2010 WL 5477250, at *14 (D. Conn. Dec. 29, 2010) (contractual language stating that account holder had not relied on bank and would not hold bank liable for investment performance was insufficient to relieve bank of fiduciary duties).  This is especially so when fiduciaries, like BNY Mellon, are reaping enormous undisclosed profits at the beneficiaries' expense.

BNY Mellon's primary argument in support of its ability to pillage its fiduciary clients' accounts without recourse is that the Policies and Procedure Form provides a range within which FX trading may be conducted and its purported disclosure that BNY Mellon is trading FX as a "principal" somehow provides it absolute immunity to charge whatever rates it unilaterally selects.  *See* Def. Br. at 26.

---

[14]    As explained in §III.B.1.e, *infra*, the full scope of BNY Mellon's fiduciary responsibilities are defined by common law and not just the MTA.  *See* ¶¶ 1, 3 (custodian has fiduciary duty to safeguard assets).  However, as explained herein, contrary to BNY Mellon's arguments, nothing in the MTA abolishes fiduciary obligations that it otherwise owes to SEPTA and the Class.

As an initial matter, it is important to note that the actual FX Procedure Form – the only document signed by clients – does ***not*** indicate that BNY Mellon is purportedly acting as "principal" for indirect FX transactions or purport to otherwise limit BNY Mellon's fiduciary obligations in any way. *See* Def. Decl., Ex. 1. Rather, the term "principal" is referenced once in the FX Policies and Procedures – a document clients do ***not*** sign – that is posted on the internet and accessible via the FX Website. However, BNY Mellon's attempt to bury the term "principal" in the FX Policies and Procedures in no way authorizes it to charge its fiduciary clients fabricated FX rates. *See, e.g., Bohler-Uddeholm*, 247 F.3d at 101 (noting demanding disclosure obligations imposed on fiduciaries seeking to profit at beneficiaries' expense); *Edmonson*, 2011 WL 1234889, at *12 (rejecting defendant's argument that "it has complied with the express terms of the plan" and therefore "it cannot be liable for a breach of fiduciary duty for that reason").

The actual language in the current version of the FX Policies and Procedures states:[15]

> [A]ll FX transaction requests received by the BNYM Foreign Exchange group on a given day will be executed that day with BNYM on a principal basis at rates that will not deviate by more or less than three (3) percent from the ***relevant Interbank bid or ask rates*** and will ***not be less favorable*** to the account than the corresponding rates indicated on the Daily Schedule for that day.

¶ 34. The foregoing language does not define "relevant" Interbank rates or how trades will be priced within the range posted by BNY Mellon. The ambiguity in the FX Policies and Procedures is, however, resolved by looking to the Standing Instructions Page, which, like the FX Policies and Procedures, is accessible via the FX Website. The Standing Instructions Page specifically assures clients that indirect FX trades are subject to "best execution" standards,

---

[15] BNY Mellon has not produced a FX Policies and Procedures dated prior to July 27, 2004. *See* Def. Br. at 9 n.5. Rather, it produced a document it "believes" to be the pre-July 2004 form and simply asks the Court, on a Rule 12 motion, to accept the veracity of this document, which is plainly improper. BNY Mellon's inability to produce the pre-2004 FX Policies and Procedures form essentially means that it has no basis whatsoever for seeking the dismissal of pre-2004 claims. *See Federated*, 2009 WL 5821045, at *3.

which require BNY Mellon to secure the best possible price at the time the trade was executed. *See* ¶¶ 28, 37, 53.[16] Moreover, prior to October 2009 BNY Mellon represented that FX trades would be "free of charge." ¶ 28; Virginia AG Compl., ¶ 80.

BNY Mellon's argument that one link from the FX Website (FX Policies and Procedures) can sever all fiduciary obligations while another link from the same website (Standing Instructions Page) is irrelevant "promotional material" is baseless. The Standing Instructions page is necessary to interpret BNY Mellon's representations in the FX Policies and Procedures. Even if BNY Mellon was acting on a "principal" basis, it was nonetheless obligated to provide "best execution" pricing based on the relevant Interbank rates and within the posted range. ¶¶ 28-29, 36-37, 53, 56. Likewise, the FX Policies and Procedures' reference to a daily range also fails to support BNY Mellon's argument. The range simply sets a floor for rates ("will not be *less* favorable") but in no way provides BNY Mellon license to charge clients fictitious rates that are unrelated to the "relevant" Interbank rates.

SEPTA's position with respect to the non-remarkable nature of the FX Procedure Form and BNY Mellon's non-descript reference to acting as "principal" buried in the FX Policies and Procedures is supported by the multiple lawsuits and investigations against BNY Mellon by

---

[16] BNY Mellon's argument that the term "best execution" applies only to "efficient administration" and not pricing, Def. Br. at 3, simply provides Defendants' own interpretation of their obligations. Defendants' self-serving statements – which are squarely rejected by BNY Mellon's clients, *see* ¶¶ 28-29, 37, 39, 53 – is an insufficient basis to seek dismissal under Rule 12. *See Graboff v. The Collern Firm*, Civ. A. No. 10-1710, 2010 WL 4456923, at *10 (E.D. Pa. Nov. 8, 2010) ("factual disputes cannot serve as the basis for dismissal"). In any case, "best execution" is a technical term that imposes an obligation to use reasonable diligence to provide best possible pricing to customers. *See* Def. Br. at 17-18 n.13 (citing authorities defining "best execution"); *see also* ¶¶ 28-29, 37, 39, 53. Indeed, BNY Mellon's own presentations, consistent with common industry usage, define "best execution" as "quantitative proof that an agent or trader obtained the *best available price* in the market." Meltzer Decl., Ex. D at p. 12 (3Q09 BNY Mellon Asset Servicing Glossary). Defendants, sophisticated financial institutions, having chosen to use the term "best execution" in communications to the market cannot, on a motion to dismiss, ask the Court to completely ignore the commonly understood usage of the term and instead rely upon their own self-created and self-serving definition. As noted by Judge Conti in *Zeno*, the rules of contract interpretation require that "technical terms and words of art [be] given their technical meaning when used in a transaction within their technical field." 480 F. Supp. 2d at 838 n.13. Defendants' arguments here seeking dismissal based on their own unique definition of "best execution" is therefore entirely misplaced. *See id.*

other custodial clients and state attorneys general. *See* ¶ 6 (*qui tam* actions); ¶ 53 (LACERA); ¶ 55 (SEC investigation); ¶ 56 (corroboration with SEPTA's allegations). These clients' views of their relationship with BNY Mellon strongly support SEPTA's allegations that BNY Mellon has fiduciary obligations when trading FX for the benefit of its clients. *See* ¶¶ 28, 53 (letter from LACERA to BNY Mellon stating "that the bank ***was its fiduciary***, so it should have looked out for the fund's interests and offered it ***'best execution,' or the best possible price***" when trading FX).[17]

BNY Mellon's May 2, 2011 disclosure to clients (¶¶ 49-51) – in which it acknowledged that it "tend[s] to purchase currencies" for its "clients towards the low end of the interbank range and sell towards the high end" – also undermines its argument that there "is no factual basis for the claim that BNY Mellon expressly entered a fiduciary relationship with respect to FX services." Def. Br. at 26. If the Company's Class Period disclosures and singular reference to "principal" were as clear as BNY Mellon now claims, there would be no reason for BNY Mellon to provide clients with "additional" information about its FX services. *See* ¶ 49. The disclosures made in the FX Corrective Disclosure, for the first time, revealed, *inter alia* that:

- Indirect FX trading is "ancillary to and independent of the basic custodial relationship;"

- Clients and investment managers using indirect FX trading services "receive those services separately from the custodial relationship;"

- BNY Mellon does "not enter the FX market to trade on behalf of or for the benefit of clients – as an investment manager would;" and

- BNY Mellon "tend[s] to purchase currencies" for its "clients towards the low end of the interbank range and sell towards the high end. . . ."

---

[17]     Any ambiguity over whether the FX Procedure Form limited BNY Mellon's fiduciary obligations is construed against BNY Mellon, the sole drafter of the language in question. *See Sun Co., Inc. (R&M) v. Pa. Turnpike Comm'n*, 708 A.2d 875, 878-79 (Pa. Cmwlth. 1998) ("any ambiguous language in a contract is construed against the drafter and in favor of the other party").

¶ 50; *see also* Def. Decl., at Ex. 10.  BNY Mellon was required to make each of the foregoing disclosures **before** extracting its first dollar of illicit FX related profits from its beneficiaries – not more than a decade later.  *See Glaziers and Glassworkers Union Local No. 252 Annuity Fund v. Newbridge Sec. Inc*., 93 F.3d 1171, 1180 (3d Cir. 1996) (a fiduciary's duty "entails not only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence might be harmful.").  The FX Corrective Disclosure clearly highlights the inadequacy of BNY Mellon's Class Period disclosures to clients.  *Compare* Def. Decl., at Exs. 1-7 *with id.* at Ex. 10.

The holding in *State Street*, which involves facts strikingly similar to the matter at bar, is also instructive.  In *State Street*, the California Attorney General filed a lawsuit on behalf of two California pension funds against the funds' custodial bank – State Street Corp. – accusing it of reaping improper profits by charging the funds post-execution FX rates rather than the prevailing market rate at the time the FX trade was executed.  State Street Corp. filed a demurrer making many of the same arguments BNY Mellon makes here.  *Compare id.* at 1 ("Defendants contend they are entitled to receive compensation for [FX] trades") *with* Def. Br. at 17-18 n.13 (brokers subject to "best execution" are still entitled to earn a profit).  The court overruled State Street Corp.'s demurrer and refused, based on the pleadings, to conclude that State Street Corp.'s fiduciary obligations extended to some transactions (custodial services) but not to FX trading. *See id.* at 2.  As explained by the court, "**whether [custodial banks] are fiduciaries for some transactions and not for others cannot be determined on demurrer**." *Id.*

Judge Hutton's decision in *Thompson* is equally in accord.  There "[t]he parties agree that [the defendant] owed a fiduciary duty to the plaintiffs.  They disagree, however, about the contours of that duty. . . ."  1994 WL 683378, at *2.  Judge Hutton refused to grant defendant's

motion for summary judgment after concluding that the contours of an acknowledged fiduciary duty is a question of fact. *Thompson*'s result is even more warranted here given that Defendants' motion is under Rule 12, rather than a motion for summary judgment filed after completion of discovery. *See Federated*, 2009 WL 5821045, at *3 (motions to dismiss should not be assessed under Rule 56 standards); *Graboff*, 2010 WL 4456923, at *5 (factual disputes "[are] not a sufficient reason to grant a Motion to Dismiss").

Just as in *State Street* and *Thompson*, BNY Mellon admits it owes fiduciary obligations to SEPTA. *See* Def. Br. at 25; ¶ 18. The only dispute here is whether BNY Mellon is a "fiduciar[y] for some transactions and not." *See State Street*, at 2. Given the highly factual nature of this inquiry and BNY Mellon's assertions, which are directly contradicted by the well-pled allegations in the Complaint, BNY Mellon's arguments fail to meet Defendants' burden on a Rule 12 motion. *Cf. Thompson*, 1994 WL 683378, at *2; *State Street*, at 2; *Edmonson*, 2011 WL 1234889, at *12 ("if the parties dispute the facts that establish the defendant's fiduciary status . . . then the issue should not be resolved at the motion to dismiss stage").

> **b.** **The Appointment of Investment Managers Does Not Absolve BNY Mellon From All Fiduciary Responsibilities**

BNY Mellon also seeks to absolve itself of all fiduciary obligations by arguing that under Section 5.2 of the MTA, SEPTA's appointment of investment managers releases BNY Mellon from all liability relating to FX trading. Def. Br. at 25. This argument is not even supported by Defendants' cited documents.

While BNY Mellon may not have ***investment*** obligations once SEPTA appoints an investment advisor, Section 5.2 ***does not*** absolve BNY Mellon from ***all*** fiduciary responsibilities. In fact, Section 5.2 specifically states that BNY Mellon will continue to act "in the capacity of [a] custodian" once assets are allocated to investment advisors, which includes the obligation to

protect SEPTA's assets. *See* MTA §§5.2; 8; ¶ 19. Defendants' arguments wholly ignore the fact that Plaintiff's claims have nothing to do with BNY Mellon's failure to "invest" assets in its custody; the claims here focus on BNY Mellon's undisclosed profiteering at SEPTA's expense without adequate disclosure. *See In re Estate of Evasew*, 584 A.2d 910, 912 (Pa. 1990) (a fiduciary obtaining a benefit has the burden to establish "that there was no abuse of the confidence, that he has acted in good faith, and that the act by which he is benefited was the free, voluntary, and independent act of the other party, done with full knowledge of its purpose and effect"). *Cf.* 29 U.S.C. §1110 ("any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under [ERISA] . . . shall be void as against public policy").

BNY Mellon's argument is further eroded by Section 6.1 (as amended), which imposes liability if BNY Mellon knowingly participates in breaches by investment managers, enables investment managers to breach their obligations, or if BNY Mellon "has actual knowledge" that an investment manager is breaching its obligations to SEPTA. *See* Amended MTA ¶ 7 (amending §6.1). Thus, BNY Mellon continues to have non-investment obligations to SEPTA to safeguard its assets even after assets are allocated. *See* MTA §8; *see also Levinson*, 2010 WL 5477250, at *14. Further, even if BNY Mellon's role as a trustee is limited to non-discretionary activities for allocated assets, it nevertheless owes fiduciary obligations to protect assets entrusted to its care. *See Edmonson*, 2011 WL 1234889, at *14 ("Plaintiff's breach of fiduciary duty claim is based on facts relating to Defendant's management or disposition of plan assets. Therefore, Defendant's argument that it 'could not possibly have exercised discretionary authority' over the benefits . . . is unavailing.").

Finally, even if SEPTA's investment managers instructed BNY Mellon to trade FX, black letter trust law puts the burden on the trustee (BNY Mellon) to provide beneficiaries (SEPTA and the Class) with all "material facts affecting the interest of the beneficiary which he knows the beneficiary does not know and which the beneficiary needs to know for his protection in dealing with a third person." *Bixler v. Central Pa. Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1300 (3d Cir. 1993) (quoting Restatement (Second) of Trusts § 173, comment d). Thus, BNY Mellon was obligated to disclose its knowledge about its own FX practices. *See id.* At no time was BNY Mellon permitted to blindly follow investment managers' instructions and enjoy absolute immunity for its own undisclosed and unlawful misconduct. *See id.*; *see also* Amended MTA ¶ 7.

### c.     BNY Mellon's Self-Dealing is Presumptively Void

As explained above, the MTA (and the amendments thereto) contemplate that BNY Mellon will act as a fiduciary ***and*** provide "best execution" pricing when trading FX. *See* § III.B.1.a.-b., *supra*. BNY Mellon also represented FX trading would be "free of charge." ¶ 28. BNY Mellon's admitted failure to apply "best execution" pricing (¶ 50), thus, essentially charging fees for FX trades during the Class Period, resulted in BNY Mellon reaping significant secret profits at its clients' expense and constitutes a breach of its fiduciary obligations. *See Glaziers*, 93 F.3d at 1180 (requiring full disclosure by fiduciaries); *see also Hill*, 2011 WL 3420439, at *13 (allegations that custodial bank manipulated FX rates "paint[s] a plausible picture of a company ***defrauding its [custodial] clients***"); Virginia AG Compl., ¶ 80.

Even if "best execution" pricing – a term BNY Mellon uses and distributes via its website – is not part of any agreement governing FX trades, presenting the FX Procedures Form to SEPTA in the first place without making full disclosure about the illicit profits BNY Mellon intended to reap at the expense of its fiduciary clients renders the document itself presumptively

void.  Pennsylvania law presumes that transactions benefiting a fiduciary at the expense of its beneficiaries are invalid and places the burden of establishing the fairness of the transaction on BNY Mellon.  *See Evasew*, 584 A.2d at 913 ("transactions between persons occupying a confidential relationship are *prima facie* voidable, and the party seeking to benefit from such a transaction must demonstrate that it was 'fair, conscientious, and beyond the reach of suspicion'").  BNY Mellon is not permitted to present beneficiaries with documents that fail to fully explain the benefits to BNY Mellon and then rely on those very documents as a shield against claims by injured beneficiaries.  *See id.* at 912 ("if the superior party obtains a possible benefit, equity raises a presumption against the validity of the transaction *or contract*, and casts upon such party the burden of proving fairness, honesty, and integrity in the transaction *or contract*"); *Bohler-Uddeholm*, 247 F.3d at 102 ("it makes perfect sense to place the burden on a fiduciary to explain business actions which benefitted itself over its beneficiary").

In any case, BNY Mellon's disclosures to its custodial clients are the subject of an ongoing SEC probe (¶ 55) and other clients, in addition to SEPTA, have openly rejected BNY Mellon's interpretation of its obligations being offered here (¶¶ 40, 53).[18]  These facts plainly undermine BNY Mellon's arguments seeking to dismiss this case on a Rule 12 motion.  *See Evasew*, 584 A.2d at 912; *see also Hill*, 2011 WL 3420439, at *13 (noting corroborative nature of plaintiffs' allegations).

### d.  Beneficiaries Justifiably Reposed Trust in BNY Mellon

Separate and apart from the fiduciary obligations BNY Mellon owes SEPTA and the Class for FX trading arising from its status as trustee, SEPTA reposed complete trust in BNY Mellon through participation in the indirect FX trading program.  *See* ¶¶ 3-4, 26, 82.  This trust

---

[18]     Since the FX Policies and Procedures are posted on the FX website, all ongoing federal, state, and client investigations likely concern identical disclosures.

was justified given BNY Mellon's status as a trustee and its absolute control over all aspects of indirect FX trading, "including the cost and time of the trade." ¶ 45. The trust reposed in BNY Mellon created a confidential relationship between BNY Mellon and each of its beneficiaries requiring BNY Mellon to "act with scrupulous fairness and good faith in [its] dealings with the other and [to] refrain from using [its] position to the other's detriment and [for its] own advantage." *Basile v. H & R Block, Inc.*, 11 A.3d 992, 996 (Pa. Super. 2010).

Contrary to Defendants' arguments, overmastering influence is not a prerequisite to finding confidential relationship. As explained by the court in *Basile*:

> [A confidential relationship] appears when the circumstances make it certain the parties do not deal on equal terms, but, on the one side there is an overmastering influence, ***or***, on the other, weakness, dependence or trust, justifiably reposed[.] *Frowen v. Blank*, 425 A.2d 412, 416–17 (Pa. 1981) (emphasis added). The Supreme Court's use in *Frowen* of the disjunctive "or" to separate the cognizable characteristics of confidential relation is critical. Contrary to the trial court's determination in this case, our law does not require both "over[mastering] influence ***and*** ... weakness, dependence or trust.

11 A.3d at 996 (emphases in original).[19] Here, beneficiaries' complete trust in BNY Mellon is evidenced by the Company having the ability to (and then actually) abusing its beneficiaries by charging statistically unfavorable FX rates for at least a decade. *See* ¶¶ 46-47, 82; *see also* ¶¶ 43, 53; *cf. Busy Bee, Inc. v. Wachovia Bank, N.A.*, No. 97 CV 5078, 2006 WL 723487, at *23 (Pa. Com. Pl. Feb. 28, 2006) ("compelling the borrower to engage in unusual transactions" is evidence of fiduciary relationship). The highly unusual and disadvantageous FX rates simply could not have been charged unless beneficiaries completely trusted that BNY Mellon would execute FX trades without seeking to profit at its clients' expense. *See* ¶¶ 46-47 (explaining

---

[19]     *Compare Basile*, 11 A.3d at 996 *with* Def. Br. at 28 n.15 (citing cases discussing "overmastering influence").

normal distribution).  This trust was justified and gives rise to a fiduciary relationship wholly independent of the relationship evidenced by the MTA.  *See, e.g., State Street* at 2.

Defendants' cited authorities (Def. Br. at 28 & n.15) are inapposite and merely hold that there is not a *per se* confidential relationship between **commercial parties**.  *See, e.g., Valley Forge Convention & Visitors Bureau v. Visitor's Servs., Inc.*, 28 F. Supp. 2d 947 (E.D. Pa. 1998); *Devon IT, Inc. v. IBM Corp.*, Civ. A. No. 10-2899, 2011 WL 1331888, at *15 (E.D. Pa. Mar. 31, 2011) (plaintiff provided no evidence that the defendant agreed to do anything other than provide advice); *Coldwell Banker Commercial/Feist v. BEF Corp.*, No. 2007-C-1707, 2007 WL 5023233 (Pa. Com. Pl. Dec. 26, 2007); *see also eToll, Inc. v. Elias/Savion Advertising, Inc.*, 811 A.2d 10, 22 (Pa. Super. 2002) ("Appellant has cited no authority holding that an **advertising agency** is a fiduciary to its clients.") (Def. Br. at 22, 27).  None of these cases address the situation where, as here, BNY Mellon, a trustee, has conceded it is a fiduciary for some transactions.  *See* Def. Br. at 25; ¶ 18.  The same is true of Defendants' cited authorities under the heading "*FX Providers*"[20] and "*Custodians*."[21]  *See* Def. Br. at 28-29.  None of these cases suggest – let alone compel the conclusion – that a trustee, who controls all aspects of FX transactions (timing, price and level of disclosure), can engage in self-dealing without making full disclosure to its beneficiaries.  *See*

---

[20]     *See Interactive Intelligence, Inc. v. KeyCorp*, 546 F.3d 897, 898 (7th Cir. 2008) (discussing FX transactions with respect to parties with a "**commercial** banking relationship"); *Compania Sud-Americana de Vapores, S.A. v. IBJ Schroder Bank & Trust Co.*, 785 F. Supp. 411, 425 (S.D.N.Y. 1992) (concluding, on a motion for summary judgment, that "no fiduciary relationship existed between" the litigants); *In re Mexico Money Transfer Litig.*, 267 F.3d 743, 749 (7th Cir. 2001) (affirming settlement between international wire transfer companies and **retail** customers).

[21]     *See Beddall v. State St. Bank and Trust Co.*, 137 F.3d 12, 21 (1st Cir. 1998) (custodian not responsible for ensuring accuracy of real estate valuations prepared by **investment manager**); *Kahan Novoa v. Safra Nat'l. Bank of New York*, 313 F. Supp. 2d 1347, 1355-56 (S.D. Fla. 2003) (custodian not liable for losses stemming from a default by **third-party**).

*State Street* at 2; *see also Evasew*, 584 A.2d at 912; *Hill*, 2011 WL 3420439, at *13 (plaintiff sufficiently pled that custodial bank defrauded clients through its indirect FX program).[22]

As such, Plaintiff has adequately pled a breach of fiduciary duty.

### e. The "Gist of the Action" Doctrine Does Not Preclude SEPTA's Breach of Fiduciary Duty Claim

Defendants' argument seeking dismissal of Plaintiff's breach of fiduciary duty claim under the gist of the action doctrine (Def. Br. at 21-23) misconstrues Plaintiff's allegations. Plaintiff's breach of fiduciary duty claim (Count I) is based on BNY Mellon's self-dealing and inadequate disclosures, which allowed BNY Mellon to extract unreasonable fees under the guise of executing FX trades. The claim does not relate to whether BNY Mellon fulfilled its contractual responsibilities under the MTA or whether it executed FX transactions under the FX Procedures Form.[23]

The fiduciary obligations SEPTA alleges BNY Mellon breached are found in common law and not within the four corners of the MTA. BNY Mellon's contractual performance under the MTA is collateral to fiduciary obligations owed to SEPTA and the Class and, as such, the "gist of the action" doctrine does ***not*** apply. *See Graboff*, 2010 WL 4456923, at *5-7 (discussing "gist of the action" doctrine and denying motion to dismiss contract and tort claims) (Slomsky, J.).

---

[22]     *See also* Def. Br. at 30 n. 17 (*In re Mushroom Transp. Co., Inc.* 382 F.3d 325, 331 (3d Cir. 2004) (dismissing claims against a financial institution making a "good faith" transfer of funds to an embezzler); *Srein v. Frankford Trust Co.*, 323 F.3d 214, 223 (3d Cir. 2003) (mere administrative involvement in a transaction did not create fiduciary relationship); *Arizona State Carpenters Pension Trust Fund v. Citibank (Ariz.)*, 125 F.3d 715, 722 (9th Cir. 1997) (same).

[23]     Defendants' suggestion that the FX Procedure Form was entered into on an arm's-length basis (Def. Br. at 32) is absurd. The Complaint alleges a scheme through which BNY Mellon took specific steps to actively conceal its FX practices. *See* ¶¶ 57-65. At no time did SEPTA enter into any arm's-length agreements with BNY Mellon to indirectly trade FX. *See Hill*, 2011 WL 3420439, at *12 ("It is plausible that the company's FX practice resulted from Defendants' intent to ***defraud their custodial clients***").

The "gist of the action" doctrine seeks to "maintain the conceptual distinction between breach of contract claims and tort claims" by preventing "plaintiff[s] from recasting ordinary breach of contract claims into tort claims." *Howe*, 2011 WL 1465446, at *4 (refusing to apply the "gist of the action" doctrine to plaintiff's tort claims).[24]  Application of the doctrine is inappropriate where, as here, contract and tort claims are alternatively pled and the duties giving rise to tort liability flow from obligations imposed by society rather than the letter of the agreement. *See Performance HR, Ltd., Inc. v. Archway Ins. Servs. LLC*, Civ. A. No. 08-3432, 2008 WL 4739381, at *7 (E.D. Pa. Oct. 23, 2008) ("court should be very cautious to consider dismissing a claim under the 'gist of the action' doctrine, due in part to the rules allowing parties to plead multiple claims as alternative theories of liability"); *Interwave Tech., Inc. v. Rockwell Automation, Inc.*, Civ. A. No. 05-398, 2005 WL 3605272, at *13 (E.D. Pa. Dec. 30, 2005) ("[j]udicial caution is appropriate [when ruling on motions seeking application of the gist of the action doctrine] because '[o]ften times, without further evidence presented during discovery, the court cannot determine whether the gist of the claim is in contract or tort.'").

Indeed, while the relevant documents here acknowledge BNY Mellon's status as a fiduciary (¶ 18), they specifically look outside of the agreement to define the scope of the parties' obligations.  *See* MTA §5.2 (discussing limitation of responsibilities and liabilities "***normally or statutorily incident*** to a trustee"); *id.* §2.5 (the Master Trust shall be held in accordance with "***applicable law***"); *id.* §2.6 ("***[e]xcept as may be permitted by law*** . . . .").  As recognized by the Third Circuit in *Bohler-Uddeholm*, fiduciary obligations may extend "well beyond the particular obligations contained in the Agreement itself."  247 F.3d at 105; *see also Pegram v. Herdrich*, 530 U.S. 211, 225 (2000) (noting that a trustee under common law "is not

---

[24]     While courts have predicted that the "gist of the action" doctrine would be recognized in Pennsylvania, "[t]he Pennsylvania Supreme Court has not expressly adopted the gist of the action doctrine."  *See Howe*, 2011 WL 1465446, at *3.

permitted to place himself in a position where it would be for his own benefit to violate his duty

to the beneficiaries") (quoting 2A A. Scott & W. Fratcher, Trusts § 170).

> Courts have held that the gist of an action is contractual in nature:
>
> (1) where liability arises **solely** from the contractual relationship between the parties; (2) when the alleged duties breached were grounded in the contract itself; (3) where any liability stems from the contract; and (4) when the tort claim essentially duplicates the breach of contract claim or where the success of the tort claim is dependent on the success of the breach of contract claim.

*Laufen Int'l, Inc. v. Larry J. Lint Floor & Wall Covering, Co., Inc.*, No. 10-cv-199, 2010 WL

1714032, at *7 (W.D. Pa. Apr. 27, 2010). None of these situations is present here.

Pleading a breach of contract claim does not preclude a party from simultaneously

pleading a claim for breach of fiduciary duties. In cases where obligations imposed by society

run parallel to obligations imposed by contract, courts have noted that "it is possible that a

breach of contract also gives rise to an actionable tort." *Howe*, 2011 WL 1465446, at *4; *see*

*also Bohler-Uddeholm*, 247 F.3d at 105 (gist of an action lies in tort law where society imposes

fiduciary obligations).[25] Thus, whether BNY Mellon satisfied its contractual obligations – by

providing fiduciary services, including FX trades – is irrelevant to whether it may, as a fiduciary,

profit at SEPTA's expense without providing adequate disclosure. *Cf. Bohler-Uddeholm*, 247

F.3d at 101 ("Pennsylvania law shifts the burden onto fiduciaries to prove the fairness of a self-

benefitting transaction"); *Glaziers*, 93 F.3d at 1180 (discussing fiduciary's disclosure

obligations); *see also Graboff*, 2010 WL 4456923, at *7 ("Plaintiff asserts both breach of

---

[25]     *Brown & Brown, Inc. v. Cola*, 745 F. Supp. 2d 588 (E.D. Pa. 2010), relied upon by Defendants (Def. Br. at 21-22), is easily distinguishable. The *Brown* plaintiffs pled fiduciary duties **exclusively** from the parties' employment agreements. 745 F. Supp. 2d at 621 ("Plaintiffs put forth ***no allegations of breach of fiduciary duty or duty of loyalty that transcend or exist*** outside Cola's and Tola's obligations under the Employment Agreements."). As noted by the *Brown* court, the **only** references to defendants' fiduciary obligations in the relevant counts allege that defendants' "contractual restrictions" and "employment agreements" provided the basis for plaintiffs' breach of fiduciary duty and loyalty claims. *See id.* at 620-21. *Compare id. with* ¶ 82 (pleading common law basis for BNY Mellon's fiduciary obligations).

contract and torts. He is permitted to do so if the wrong is the gist of the action, with the contract being merely collateral."). Indeed, social policy demands that fiduciaries refrain from engaging in self-dealing without first making full disclosure to their beneficiaries. *See Glaziers*, 93 F.3d at 1180. And where self-dealing is involved, social policy places the burden on the fiduciary to justify the fairness of the transaction. *See Evasew*, 584 A.2d at 913. Neither obligation is imposed by the letter of the MTA.

In any case, whether BNY Mellon's conduct and disclosures here meet the standards imposed by fiduciary law to engage self-dealing and profit at its clients' expense is a factual issue inappropriate for resolution on a motion to dismiss. *See Interwave Tech.*, 2005 WL 3605272, at *13.[26]

### 2. SEPTA Properly Alleges a Breach of Contract Claim Premised on BNY Mellon's Obligation to Provide "Best Execution" Pricing for FX Trades

SEPTA alternatively pleads a claim for breach of contract against BNY Mellon for failing to apply "best execution" pricing to the Class's indirect FX trades. *See* ¶¶ 93-99 (Count III).[27] The Complaint pleads that "best execution," as the term is commonly understood, was a material term of any agreement to indirectly trade FX between BNY Mellon and the Class. *See Monarch Life Ins. Co. v. Estate of Tarone*, Civ. A. No. 09-734, 2010 WL 331703, at *4 (E.D. Pa.

---

[26]     Defendants' authorities themselves recognize the factual nature of the gist of the action doctrine. For example, in *Lewis v. Delp Family Powder Coatings, Inc.*, (Def. Br. at 23), the court, **on a motion for summary judgment**, held that an action relating to a lease for the use of commercial property sounded in contract and specifically noted that "Defendants maintain that **even after discovery**, there is insufficient evidence from which the trier of fact could find that the alleged damages resulted from some transcendent social policies making the purported lease collateral." Civ. A. No. 08–1365, 2011 WL 1230207, at *8 (W.D. Pa. Mar. 31, 2011). Other cited authorities applied the doctrine after sustaining identical claims under contract law. *See Am. Stores Props., Inc. v. Spotts, Stevens & McCoy, Inc.*, 651 F. Supp. 2d 349, 355 (E.D. Pa. 2009) (applying gist of the action doctrine to bar tort claim **after** sustaining plaintiff's breach of contract claims and noting that "Plaintiff may not then convert the same allegations into a negligence claim") (Def. Br. at 23).

[27]     "Under Pennsylvania law, the elements of a breach of contract claim include: (1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resultant damages." *Howe,* 2011 WL 1465446, at *2.

Jan. 26, 2010) ("The goal of contract interpretation is to determine the intent of the parties") (Dalzell, J.).

BNY Mellon admits its Standing Instructions Page uses the term "best execution" when discussing indirect trading. *See* Def. Br. at 15. However, it argues the FX Procedures Form and the FX Policies Procedure constitute the entirety of BNY Mellon's contractual obligations and then dismisses its own references to "best execution" on the Standing Instructions as irrelevant "promotional" material. *See* Def. Br. at 15-19. BNY Mellon's effort to retroactively limit its obligations falls well short of its burden on a Rule 12 motion.[28]

### a. The FX Procedures Form and the FX Policies and Procedures Do Not Include a Merger Clause

As an initial matter, claiming that the FX Procedures Form and the FX Policies and Procedures represent the totality of the parties' obligations for indirect FX trading (Def. Br. at 15) is not accurate. The FX Procedures Form and the FX Policies and Procedures ***do not*** include a merger or integration clause and material terms (including SEPTA's obligation to pay BNY Mellon a $25 fee for trading FX with third-parties and the advancement of funds for FX related transactions) are found in other documents. *See* Def. Br. at 12; Def. Decl., Ex. 8 at 2; Amended MTA ¶ 32.[29] Thus, the absolute immunity BNY Mellon seeks to create for itself with the FX

---

[28]    Defendants' argument that SEPTA fails to allege it "relied on" the term best execution (Def. Br. at 15) is meritless. Reliance is not an element for imposing contractual obligations. *See Ohio Cas. Ins. Co. v. LRS Constr., Inc.*, Civ. A. No. 07-MC-331, 2008 WL 4533677, at *4 (W.D. Pa. Oct. 3, 2008). This is especially true when SEPTA is seeking to hold BNY Mellon responsible for its own representations.

[29]    The absence of an integration clause distinguishes this case from *Lenzi v. Hahnemann Univ.*, 664 A.2d 1375, 1380 (Pa. Super. 1995), on which Defendants rely. Def. Br. at 16. There, the court refused to incorporate terms from a separate document into a contract that specifically stated it was the final self-contained document of the parties' rights. In fact, the court specifically noted that the absence of an integration clause (as is the case here) ***would allow*** the court to view two documents together. *See id.* at 1380 ("the [trial] court then deviated from its correct analysis when it credited, on its face, appellee's argument that Pennsylvania law recognizes that two contracts may be construed together to represent a complete transaction even where the subsequent contract contains an integration clause. What the trial court herein failed to consider is that ***we may only utilize this method where two contracts exist, and where one contract does <u>not</u> provide for a complete representation of the intent of the parties***").

Procedures Form and the FX Policies and Procedures is not well founded.

Given that the parties' FX-related obligations are not fully defined by the FX Procedures Form and the FX Policies and Procedures, reliance upon BNY Mellon's own representations that it would apply the "best execution" principles to FX transactions is necessary to define the scope of the parties' obligations. *See Zeno*, 480 F. Supp. 2d at 848-49 (denying defendants' motion for summary judgment after concluding that a jury could find that website printout and other materials could define terms of a contract).[30]   Here, the FX Procedures Form includes a hyperlink that directs clients to the FX Website on which the Company posts daily FX prices and also directly links to the FX Policies and Procedures **and** the Standing Instructions Page. *See* ¶¶ 31-37; *see also* Meltzer Decl., Ex. E (callouts are added).   The Standing Instructions Page makes specific references to BNY Mellon's application of "best execution" principles to FX transactions on behalf of its clients.   Def. Decl., Ex. 9.   The Complaint also notes that BNY Mellon described FX trading as being "free of charge."   ¶ 28.   BNY Mellon's own statements regarding application of "best execution" principles and FX trading being "free of charge" are properly considered to determine how FX transactions would actually be executed and priced. *See Zeno*, 480 F. Supp. 2d at 848-49.

The analysis in *Zeno* is instructive.   In that case, a plaintiff filed a class action lawsuit alleging that trucks purchased by the class failed to include options described in, *inter alia*, promotional material the defendant published on its website. *See Zeno*, 480 F. Supp. 2d at 829-

---

[30]     The authorities on which Defendants rely (Def. Br. at 16) are readily distinguishable. *See Murphy v. Duquesne Univ. Of the Holy Ghost*, 777 A.2d 418, 435 (Pa. 2001) (holding, **on a motion for summary judgment**, that an unreferenced statement by a third-party, the American Association of University Professors, was not part of a contract between a professor and the university); *U.S. Steel Corp. v. Lumbermens Mut. Cas. Co.*, Civ. A. No. 02–2108, 2005 WL 2106580, at *8 n.12 (W.D. Pa. Aug. 31, 2005) (discussing, **on a motion for summary judgment**, the narrow issue of whether surety rate manuals are incorporated into the parties' agreement and noting that "this court's independent research did not uncover any decisions which held as a matter of law that surety rate manuals are impliedly incorporated into suretyship agreement").

30.  Similar to BNY Mellon here, the defendants there argued that the "plaintiff cannot identify any express contractual term promising him" specific options and that he "cannot sue for breach of an unexpressed obligation . . . for which he did not expressly contract. . . ." *Id.* at 848.  The *Zeno* defendant also argued "that plaintiff cannot rely on extrinsic evidence to establish this contractual obligation, attacking the validity in particular of the ***website printouts***. . . ." *Id.*  The court rejected defendants' arguments.  *Id.* at 849 ("The arguments raised by defendant in this regard fail at the summary judgment stage of the proceedings.").  As explained by Judge Conti:

> ***Defendant's arguments attacking the kinds of evidence that plaintiff relies upon to establish this contractual obligation are insufficient to support a grant of summary judgment, but are arguments that go to the weight which a jury will give that evidence at trial***. By reason of there being genuine issues of material fact in dispute, summary judgment cannot be granted in favor of defendant on these grounds.

*Id.*

The same result is warranted here.  BNY Mellon does not dispute its FX Website (cited in the FX Procedures Form) links to the Standing Instructions Page assures clients that they will benefit from "best execution."  Rather, BNY Mellon argues, as the *Zeno* defendant argued, that statements on the web are irrelevant promotional material incapable of creating contractual obligations.  Whether or not this is the case may not be resolved even after discovery closes, and certainly cannot be done on a Rule 12 motion.  *See id.*

*Hill* provides further support for the notion that BNY Mellon's self-serving interpretation is insufficient to dismiss this action on a Rule 12 motion.  Earlier this month, Judge Gertner denied State Street Corp.'s motion to dismiss a securities fraud and ERISA class action lawsuit alleging State Street Corp. misrepresented facts about its FX revenues.  *See* 2011 WL 3420439, at *15.  In that case, State Street Corp. argued, as BNY Mellon does here, that charging custodial clients higher FX rates than State Street Corp. received was consistent with its agreements.  *See*

*id.* at *11. Judge Gertner rejected this argument. *See id.* at *12. As explained by Judge Gertner, "on a motion to dismiss, I must take all well-plead allegations as true, I am obliged to accept that, as plaintiffs allege, 'State Street was obligated to provide its [custodial] clients the same exchange rate that State Street actually used to make the [FX] trade.'" *Id.* at *11.[31]

> **b.** **The FX Procedures Form and the FX Policies and Procedures Are Ambiguous**

Even if the FX Procedure Form and the FX Policies and Procedures (but not the Standing Instructions Page) could be deemed to constitute the entire agreement, which SEPTA denies, the documents are ambiguous and require extrinsic evidence to resolve the ambiguity. *See Zeno*, 480 F. Supp. 2d at 849 ("[I]f the contract is ambiguous, then the factfinder may look to parol evidence to determine the parties' intent."). "A term is ambiguous if it can have two or more reasonable meanings. If the contract terms are ambiguous and we review extrinsic evidence, interpretation of the contract-determining ***the parties' intent-is a question of fact*** 'unless the extrinsic evidence is conclusive.'" *Monarch Life*, 2010 WL 331703, at *4-5.

As noted above, the FX Policies and Procedures state that FX trading is based on rates that "will not deviate by more or less than three (3) percent from the ***relevant*** Interbank" rates and will not be less favorable than the posted rates. When rates might deviate from the "relevant Interbank" and how the trades will be priced within the daily range provided by BNY Mellon cannot be determined from the FX Policies and Procedures but can be resolved from the Standing Instructions Page's use of "best execution." Accordingly, while BNY Mellon's FX Policies and Procedures reference a daily range, the actual trade price was based on the best available price at the time the trade was executed. ¶¶ 28-29. It is nonsensical to suggest that

---

[31] The securities claims analyzed in *Hill* are subject to heightened pleading standards under Rule 9 and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *See* 2011 WL 3420439, at *9. In contrast, SEPTA's claims here are subject to the less stringent pleading requirements of Rule 8(a).

beneficiaries would willingly agree to allow BNY Mellon to arbitrage their FX trading to extract maximum possible value based on fabricated rates. "Best execution" limits the pricing BNY Mellon could charge on any given trade.

Indeed, several of BNY Mellon's clients have publically stated their assumption that FX trades were subject to "best execution" pricing (and were "free of charge") and not what BNY Mellon argues here. *See* ¶¶ 28, 53; *see also Hill*, 2011 WL 3420439, at *13 (corroborating allegations "reinforce the same narrative"). Given this ambiguity, it is appropriate to consider extrinsic evidence, including BNY Mellon's own statements, to interpret BNY Mellon's obligations under the agreement. *See Monarch Life*, 2010 WL 331703, at *4-5; *Zeno*, 480 F. Supp. 2d at 849. In any case, the conflict between SEPTA's reasonable view of the agreement and BNY Mellon's view renders a resolution of the terms of any agreement inappropriate on a motion to dismiss. *See Monarch Life*, 2010 WL 331703, at *4-5.

### 3. SEPTA Properly Alleges a Breach of Contract Claim Premised on the Implied Covenant of Good Faith and Fair Dealing

In Count IV, Plaintiff properly alleges a breach of contract claim premised on the implied covenant of good faith and fair dealing. *See Graboff*, 2010 WL 4456923, at *4; *see also Donahue v. Federal Express Corp.*, 753 A.2d 238, 242 (Pa. Super. 2000) ("[e]very contract in Pennsylvania imposes on each party a duty of good faith and fair dealing in its performance and its enforcement."); *Zaloga*, 671 F. Supp. 2d at 629 ("we hold that the breach of the covenant of good faith and fair dealing exists in Pennsylvania as a breach of contract and allows for the award of compensatory damages"). While Pennsylvania courts do not recognize a breach of the implied covenant as an ***independent*** cause of action, courts recognize that a breach of the implied covenant is a breach of contract. *See Zaloga*, 671 F. Supp. 2d at 629; *Graboff*, 2010 WL 4456923, at *4; *McHale v. NuEnergy Group*, Civ. A. No. 01-4111, 2002 WL 321797, at *28

(E.D. Pa. Feb. 27, 2002) ("A breach of such covenant is a breach of contract action, not an independent action for breach of a duty of good faith and fair dealing."). As such, a plaintiff may bring breach of contract actions predicated upon a defendant's breach of the implied covenant. *See Graboff*, 2010 WL 4456923, at *4.

Defendants' attempt to undermine Count IV by characterizing it as a stand-alone claim for breach of the implied covenant of good faith and fair dealing (Def. Br. at 19-21) is baseless. Plaintiff has clearly pled Count IV as a breach of contract claim. First, Plaintiff has captioned Count IV as a breach of contract action by using the language "BREACH OF CONTRACT – BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING." Second, Count IV repeatedly speaks in terms of "breach[ing] the FX Procedure Documents," which unequivocally references the contract at issue.[32]

Although the implied covenant of good faith and fair dealing "varies somewhat with the context," a party's duty of good faith requires "[h]onesty in fact in the conduct or transaction concerned." *Somers v. Somers*, 613 A.2d 1211, 1213 (Pa. Super. 1992). This duty prevents, among other things, the "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." *Id*. While these obligations cannot "override the express terms of a contract," *Bedrock Stone & Stuff, Inc. v. Mfrs. & Traders Trust Co.*, Civ. A. No. 04-02101, 2005 WL 1279148, *28 (E.D. Pa. May 25, 2005), "[c]ourts imply good faith duties in order 'to harmonize the reasonable expectations of the parties with the intent of the contractors and the terms in their contract.'" *Kamco Indus. Sales, Inc. v. Lovejoy, Inc.*, Civ. A. No. 09-1407, 2011 WL 891825, at *8 (E.D. Pa. Mar. 10, 2011). As such, "[t]he

---

[32]     The FX Procedure Form, FX Policies and Procedures, and Standing Instructions Page are collectively referred to as the "FX Procedure Documents." ¶ 95.

purpose of these implied covenants is to prohibit a party from taking advantage of gaps in a contract in order to exploit the vulnerabilities that arise when contractual performance is sequential rather than simultaneous." *Id*. at *8. As this Court noted in *Graboff*, "[b]ecause facts and circumstances amounting to a breach of the duty of good faith and fair dealing cannot always be precisely defined, whether the conduct of a defendant constitutes a breach is frequently a question of fact. At the motion to dismiss stage, the Court will accept as true the facts as contained in the Complaint. If the Complaint contains facts that could amount to a breach of this duty, it will survive the Motion to Dismiss." 2010 WL 4456923, at *4 (denying motion to dismiss breach of contract claim for breaching duty of good faith and fair dealing).

Here, contrary to Defendants' assertions, the FX Procedure Documents do **not** detail how Defendants are to calculate the FX rates charged to Plaintiff – instead, they simply set out the parameters within which those rates must fall.[33] SEPTA, as a beneficiary, entrusted its assets to BNY Mellon and justifiably expected BNY Mellon to execute FX transactions at prevailing rates and not to profit at SEPTA's expense without proper disclosure. Instead, BNY Mellon exploited its superior knowledge of the FX rates to extract significant profits for itself from SEPTA and the Class. To the extent there is any ambiguity in the agreement, BNY Mellon's exploitation of the ambiguity is exactly the type of manipulative behavior the covenant of good faith and fair dealing seeks to eliminate. *See Temple Univ. Hosp., Inc. v. Group Health, Inc.*, Civ. A. No. 05-

---

[33]     The authorities upon which Defendants rely to argue that SEPTA "cannot use the implied covenant of good faith and fair dealing with respect to matters addressed by express terms of its agreement" (Def. Br. at 20) are plainly inapposite. In *Hutchison v. Sunbeam Coal Corp.*, for instance, the Supreme Court of Pennsylvania held that there could be no implied duty to mine coal when the lease at issue contained a provision that "dealt expressly with the possibility of a failure to mine by providing for minimum advance royalties." 519 A.2d 385, 389 (Pa. 1986). Here, other than BNY Mellon's promise to apply "best execution" pricing, there is no express provision describing the methodology for BNY Mellon's calculation of FX rates. Separately, *Northview Motors, Inc. v. Chrysler Motors Corp.*, 227 F.3d 78, 91 (3d Cir. 2000), *USX Corp. v. Prime Leasing Inc.*, 988 F.2d 433, 438 (3d Cir. 1993), and *Allstate Transp. Co. v. SEPTA*, Civ. A. No. 97-1482, 2000 WL 329015, at *17 (E.D. Pa. Mar. 27, 2000) refused to allow **independent** claims for breach of the implied covenant. Here, the implied covenant claim is clearly plead as a breach of contract. *See Zaloga*, 671 F. Supp. 2d at 631 ("It has been said that a breach of the implied covenant of good faith and fair dealing merges with a breach of contract claim.").

37

102, 2006 WL 146426, at *5 (E.D. Pa. Jan. 12, 2006) ("Undisclosed, inflated charges are not consistent with 'honesty,' and may be an 'abuse of a power to specify terms.'"); *Zaloga*, 671 F. Supp. 2d at 629; *Kamco*, 2011 WL 891825, at *11 (sustaining breach of contract claim premised on breach of duty of good faith where plaintiff had "a justifiable expectation" that defendant would not act in a certain manner); *Bedrock*, 2005 WL 1279148, at *8 ("The covenant of good faith may be breached when a party unreasonably exercises discretion authorized in a contract."). Had the parties intended that Defendants would unfavorably "purchase currencies" for "clients towards the low end of the interbank range and sell towards the high end," ¶ 51, a provision explicitly allowing such conduct would presumably have been included in the contract.[34]

Accordingly, Defendants' undisclosed pricing practices violate their duty of good faith and constitute a breach of contract and SEPTA has properly pleaded a cognizable claim.[35] *See Hill*, 2011 WL 3420439, at *15.

### 4. SEPTA Properly Alleges an Unjust Enrichment Claim Against All Defendants

Defendants argue Plaintiff's unjust enrichment claim should be dismissed because the "entire relationship between SEPTA and BNY Mellon [was] indisputably based upon a written agreement." Def. Br. at 24. Defendants further argue Plaintiff cannot assert an unjust enrichment claim "directly" against BNY Mellon Corp. because BNY Mellon Corp. is "not

---

[34]     As further evidence that such conduct was not contemplated by the parties at the time of contracting, Defendants attempt to import permission to consistently charge fabricated rates into the FX agreement through the FX Corrective Disclosure.  As discussed *supra*, the FX Corrective Disclosure is nothing more than an attempt to rewrite the scope of the FX agreement after being confronted with numerous lawsuits and investigations.  Moreover, even if BNY Mellon's representation that it provided FX services consistent with "best execution" principles is found not to form the basis of contractual obligations, it nonetheless is indicative of SEPTA's reasonable expectation that FX transactions would be executed in a manner that comported with the principals of good faith and fair dealing.

[35]     In the event this Court finds Count IV to assert an independent and non-cognizable "breach of the implied covenant" claim, Plaintiff respectfully requests that the allegations of Counts III and IV be merged.  *See Wulf v. Bank of Am., N.A.*, Civ. A. No. 10-5176, 2011 U.S. Dist. LEXIS 71906, at *18 (E.D. Pa. Apr. 15, 2011) ("incorporat[ing] the paragraphs of the Complaint relating to the breach of good faith and fair dealing into the breach of contract section" is the "logical solution").

alleged to have provided any services to SEPTA." Def. Br. at 33-34. Neither argument has merit.

### a.    SEPTA May Plead Breach of Contract and Unjust Enrichment as Claims in the Alternative

Defendants' contention that SEPTA may not assert a claim for unjust enrichment because the parties' relationship arises out of a written contract is based upon a fundamental misunderstanding of the rules governing pleading, which expressly allow pleadings in the alternative. *See* Rule 8(d); *see also Levine*, 682 F. Supp. 2d at 468-69 ("At this stage, therefore, the Court will permit Plaintiffs to plead unjust enrichment in the alternative"). Rule 8(d) permits parties to "plead alternative and inconsistent theories of recovery, even if precluded from ultimately recovering under quasi-contract theories in light of a written contract." *Cohen, Seglias, Greenhall, Pallas, & Furman, P.C. v. Hessert Constr*., Civ. A. No. 10-6183, 2011 WL 382571, at *9 (E.D. Pa. Feb. 4, 2011) (denying defendants' motion to dismiss unjust enrichment and *quantum meruit* claims). Because Rule 8 permits plaintiffs to pursue alternative theories of recovery, "[t]he mere existence of a written contract between the parties does not bar an unjust enrichment claim." *PPG Indus., Inc. v. Generon IGS, Inc*., 760 F. Supp. 2d 520, 526 (W.D. Pa. 2011).

Courts in this Circuit—including this Court—routinely allow plaintiffs to plead quasi-contract claims such as unjust enrichment in the alternative notwithstanding the alleged existence of a written contract between the parties. *See, e.g.*, *Schwartz v. Lawyers Title Ins. Co*., 680 F. Supp. 2d 690, 715 (E.D. Pa. 2010) (Slomsky, J.); *Levine*, 682 F. Supp. 2d at 468-69; *Coleman v. Commonwealth Land Title Ins. Co*., 684 F. Supp. 2d 595, 621 (E.D. Pa. 2010) (Slomsky, J.).[36]

---

[36]    *See also CDL Med. Tech, Inc. v. Malik*, No. 10-cv-821, 2011 WL 487605, at *2-3 (W.D. Pa. Feb. 7, 2011); *Cohen*, 2011 WL 382571, at *9; *Axis Specialty Ins. Co. v. The Brickman Group, Ltd., LLC*, Civ. A. No. 09-3499, 2010 WL 376784, at *3-4 (E.D. Pa. Jan. 28, 2010); *Gonzalez v. Old Kent Mortgage Co.*, Civ. A. No. 99-5959, 2000

Defendants have not offered any reason for the Court to depart from its prior rulings on this issue.

Even assuming *arguendo* that Plaintiff cannot ultimately recover under both breach of contract and unjust enrichment theories, SEPTA is entitled at this stage of the proceeding to plead both breach of contract and unjust enrichment claims in the alternative. *See Baker v. Family Credit Counseling Corp.*, 440 F. Supp. 2d 392, 420 (E.D. Pa. 2006).

### b. BNY Mellon Corp. Can Be Liable for Unjust Enrichment

Nor is the fact that BNY Mellon Corp. is "not alleged to have provided any services to SEPTA" any basis for dismissal of the unjust enrichment claim asserted against it. Def. Br. at 33-34. A claim for unjust enrichment does not require that a plaintiff "directly" confer benefits on a defendant—it simply requires that benefits are conferred. *See id.* at 420 ("Plaintiffs need not have directly dealt with each defendant in order to allege a claim of unjust enrichment against them").[37] SEPTA is not seeking to hold BNY Corp. vicariously liable for BNY Mellon's misconduct; instead, SEPTA's unjust enrichment theory is predicated on illicit funds flowing from BNY Mellon up to BNY Mellon Corp. as a result of BNY Mellon's unlawful conduct in connection with FX transactions. *See* ¶ 13. Accordingly, Defendants' argument fails.

Here, SEPTA alleges that BNY Mellon generated $886 million in "foreign exchange and other trading revenue" in 2010. ¶ 22. Plaintiff further alleges that BNY Mellon Corp.'s principal assets and sources of income are derived from its principal bank subsidiaries,

---

WL 1469313, at *6-7 (E.D. Pa. Sept. 21, 2000). Even the cases upon which Defendants rely support this notion: "Because the Federal Rules of Civil Procedure enable the plaintiffs to plead in the alternative, a claim for breach of contract and unjust enrichment can coexist at this early stage of litigation." *Alpart v. Gen. Land Ptnrs., Inc.*, 574 F. Supp. 2d 491, 507 (E.D. Pa. 2008) (Def. Br. at 23-24).

[37] The elements of a claim for unjust enrichment are: (1) benefits conferred on defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) retention of such benefits under circumstances that it would be inequitable for defendant to retain the benefit without payment of value. *Baker*, 440 F. Supp. 2d at 419.

Defendant BNY Mellon and BNY Mellon, N.A. ¶ 13. By secretly manipulating FX transactions of SEPTA and other clients, BNY Mellon unjustly enriched not only itself, but also its parent, BNY Mellon Corp. In other words, SEPTA and the Class conferred a benefit on both BNY Mellon and BNY Mellon Corp. by virtue of BNY Mellon's illicit FX transaction scheme, and it would be inequitable for any Defendant named in this case to retain those benefits.[38]

### 5. SEPTA's Claims Are Timely

Defendants' argument that Plaintiff's claims are time-barred also fails. *See* Def. Br. at 32-33. As an initial matter, Defendants improperly raise a statute of limitations defense by motion rather than their answer. In any event, even if Defendants' argument was proper at this stage, which it is not, Plaintiff's claims are tolled by virtue of the discovery rule and/or the equitable tolling doctrine. Thus, Defendants' argument is both procedurally and substantively baseless.

As a threshold matter, "[Rule] 8(c) requires that a defendant plead an affirmative defense, such as a statute of limitations, ***in his answer***." *Martin v. Ford Motor Co.*, 765 F. Supp. 2d. 673, 686 (E.D. Pa. 2011) (Slomsky, J.) (quoting *Robinson v. Johnson*, 313 F.3d 128, 134 (3d Cir. 2002)); Fed. R. Civ. P. 8(c). Notably, Rule 12(b) lists defenses that may be raised by motion, but does not include statute of limitations. Fed. R. Civ. P. 12(b); *id.* at 686. Therefore, "a limitations defense must be raised in the answer, since Rule 12(b) does not permit it to be raised by motion." *Id.* at 686.

The Third Circuit "recognizes an exception to the general rule that a statute of limitations defense be raised in an Answer." *Id.* at 686. However, a limitations defense may be raised by motion under Rule 12(b)(6) "only if the time alleged in the statement of a claim shows that the

---

[38]     Moreover, since BNY Mellon Corp. and SEPTA are not in contractual privity (Def. Br. at 33), "plaintiffs' claim for unjust enrichment against [BNY Mellon Corp.] may proceed for that additional reason." *Baker*, 440 F. Supp. 2d at 420.

cause of action has not been brought within the statute of limitations." *Id*. Thus, the Third Circuit rule "requires it be clear, from the face of the Complaint, that the claim is barred by the statute of limitation." *Id*. Further, a cause of action does not accrue until "the first significant event necessary to make the claim 'suable' occurs." *Id*. at 686.

Here, as in *Martin*, it is not clear from the face of the Complaint that Plaintiff's claims are barred by the applicable statutes of limitations; indeed, quite the opposite. The first significant event necessary to make Plaintiff's claims "suable" was the unsealing of the Virginia and Florida Actions in January and February 2011, respectively. Plaintiff did not, and could not, have discovered Defendants' fraud until that time. *See Martin*, 765 F. Supp. 2d at 686 ("It may not have been suable until Plaintiff discovered the defect or rather when the defect manifested itself.").

Plaintiff alleges Defendants failed to provide SEPTA with information on its account statements, such as time stamped execution prices, to allow SEPTA to discover that BNY Mellon was manipulating the FX rates SEPTA was being charged. ¶ 57. Further, the account statements Defendants provided to SEPTA indicated FX rates that were generally within the daily range of FX rates. ¶ 62. SEPTA was not aware, and Defendants did not disclose, that:

- The costs of the reported FX transactions executed by BNY Mellon were ***not*** the actual FX costs it incurred and were not consistent with the actual market FX rates at the time SEPTA's trades were executed;

- BNY Mellon would and did retain the difference between the actual FX rates it incurred to execute a trade and the manipulated FX rates it charged SEPTA; or

- BNY Mellon would take hidden fees or profits from the FX transactions it executed, including mark-ups or mark-downs, when executing FX trades on SEPTA's behalf.

¶ 63.

Because it is not clear from the face of the Complaint that Plaintiff's claims are time-barred, the Third Circuit rule is not applicable and Defendants' motion to dismiss is not the

proper method for resolution any statute of limitations defense. *See Martin*, 765 F. Supp. 2d at 687 ("the statute of limitations defense may be raised in an Answer and litigated at a future date, not by this Motion [to dismiss]").

Should the Court determine that Defendants' statute of limitations defense is properly before the Court at this time, Defendants' argument nevertheless fails because Plaintiff's claims are tolled by the discovery rule and/or the equitable tolling doctrine. "[I]t is well-established that Pennsylvania law recognizes a 'discovery rule' exception to the statute of limitations which delays the running of the statute." *Beauty Time, Inc. v. VU Skin Sys., Inc.*, 118 F.3d 140, 144 (3d Cir. 1997). Under Pennsylvania's discovery rule, the statute of limitations does not begin to run until "the plaintiff reasonably knows, or reasonably should know: (1) that he has been injured, and (2) that his injury has been caused by another party's conduct." *Mushroom*, 382 F.3d at 338.

Similarly, equitable tolling will suspend the running of the statute of limitations "(1) where the defendant has actively misled the plaintiff respecting the plaintiff's cause of action; (2) where the plaintiff in some extraordinary way has been prevented from asserting his or her rights; or (3) where the plaintiff has timely asserted his or her rights mistakenly in the wrong forum." *Id*. at 338-39. Although the discovery rule and equitable tolling each require the plaintiff to demonstrate "reasonable diligence" in ascertaining the existence of the injury, determinations regarding "reasonable diligence" are "typically within the jury's province unless the 'facts are so clear that reasonable minds cannot differ.'" *Id*. at 339 (quoting *Melley v. Pioneer Bank, N.A.*, 834 A.2d 1191, 1201 (Pa. Super. 2003)).

Applying this principle, courts have found that where a fiduciary relationship exists between the parties, such as the situation here, the statute of limitations is tolled due to the fiduciary's position of trust over the principal:

> Where a fiduciary commits an act of fraud against his principal, the statute of limitations will be tolled, since the very position the fiduciary is in prohibits the principal from uncovering the fraud. Furthermore, the fiduciary, because of his position of trust, would have an affirmative duty to the principal to disclose the fraud. Absent a disclosure, the fiduciary commits an act of continual covering up of the fraud.

*Beauty Time*, 118 F.3d at 144; *see also Gurfein v. Sovereign Group*, 826 F. Supp. 890, 919 n.31 (E.D. Pa. 1993) ("Because of a fiduciary's unique position of trust, the presence of a fiduciary relationship would be pertinent to the question of when a plaintiff's duty to investigate arose."). Indeed, "it is this type of very special relationship that enables a wayward fiduciary to engage in acts of concealment that cause the principal to relax vigilance or deviate from the right of injury. To require a principal to engage in aggressive oversight of its fiduciary's conduct is to deny the very essence of a fiduciary relationship." *Mushroom*, 382 F.3d at 342 (quoting *Rubin Quinn Moss Heaney & Patterson, P.C. v. Kennel*, 832 F. Supp. 922, 935 (E.D. Pa. 1993)).

Here, the Complaint pleads specific steps BNY Mellon took to conceal its conduct, including:

- Controlling all aspects of FX trading including time and price and all records related thereto (¶ 60);

- Providing clients reports that lacked time stamps (¶ 57);

- Providing FX prices that fell near the daily range (¶ 57); and

- Coordinating prices between the Company's New York and Pittsburgh offices through a system called "Charlie" to create "fake trades" (¶ 61);

Simply put, Plaintiff could not have been aware of Defendants' FX scheme until, at the earliest, the information contained in Virginia and Florida Actions was unsealed. In fact, the Virginia AG Complaint credits the relator filing the *qui tam* suit for bringing "much of the conduct in question" to the Attorney General's attention. *See* Virginia AG Compl., ¶ 58. The relator is a former BNY Mellon employee with "deep and sophisticated knowledge" and "personal

experience" with the FX practices at issue. *Id.*, ¶¶ 59, 61. The Virginia AG Complaint also pleads internal BNY Mellon emails where Company officials boast about maintaining FX spreads by being "late" to the FX "transparency space" (*i.e.,* continuing to withhold information from clients). *Id.*, ¶ 121.

Defendants seek to turn the relevant inquiry on its head by arguing that SEPTA's statistical analysis (¶¶ 46-47) could have been performed "at all times." *See* Def. Br. at 33. But prior to the Virginia and Florida actions being unsealed, there was neither reason for SEPTA to suspect that BNY Mellon was breaching its duties nor any cause for SEPTA to spend the time and money necessary to conduct a statistical analysis of its FX trades. As the Third Circuit has recognized, "[t]o require a principal to engage in aggressive oversight of its fiduciary's conduct is to deny the very essence of a fiduciary relationship." *Mushroom*, 382 F.3d at 342. Defendants' contention that SEPTA was somehow required to undertake the cost and burden of such a detailed analysis as a matter of course is absurd. Because Defendants actively concealed their misconduct, Plaintiff's claims are timely.[39]

### 6. Defendants Have Not Provided Any Basis to Strike References to THE WALL STREET JOURNAL Articles

In a footnote, Defendants make a passing request that "all references to the WALL STREET JOURNAL articles" be stricken. Def. Br. at 12 n.9. This "toss-off" argument is baseless. *See*

---

[39] The decisions on which Defendants rely do not support their argument, as all occur in the context of a motion for summary judgment or address a situation where the plaintiff failed to plead specific facts detailing the steps taken by a defendant to conceal its scheme. *See Fin. Software Sys., Inc. v. Lecocq*, Civ. A. No. 07-3034, 2008 WL 2221903 (E.D. Pa. May 27, 2008) ("the Complaint makes clear that plaintiff had knowledge of its alleged injuries by July of 1997, and plaintiff cannot rely on equitable tolling to save its claims for monetary damages"); *Cole v. Lawrence*, 701 A.2d 987, 988-99 (Pa. Super. 1997) (partial payment of debt owed on terminated agreement did not toll limitations period); *Packer Soc'y. Hill Travel Agency, Inc. v. Presby. Univ.*, 635 A.2d 649, 652-53 (Pa. Super. 1993) (discussing limitations period without discussing tolling); *Anserphone, Inc. v. Bell Atl. Corp.*, 955 F. Supp. 418, 431 (W.D. Pa. 1996) (addressing limitations on a motion for summary judgment without addressing any effort by the defendants to conceal their misconduct).

*Monarch Life*, 2010 WL 331703, at *1 n.1 (refusing to consider "toss-off and unsupported" arguments in a footnote).

When "deciding motions to dismiss pursuant to Rule 12(b)(6), courts generally consider only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim." *Lum v. Bank of Am.*, 361 F.3d 217, 222 n.3 (3d Cir. 2004). Documents are considered to form the basis of a claim if they are "integral to or explicitly relied upon in the complaint." *Id*.

The Third Circuit places no further constraints on what extraneous documents may form the basis of the claim. Here, THE WALL STREET JOURNAL articles cited in the Complaint are properly before the Court as Plaintiff "explicitly relied upon" and cited the articles. Such reliance is proper under Third Circuit law. Indeed, courts in the Third Circuit routinely consider articles, including those published in THE WALL STREET JOURNAL, that have been relied upon by plaintiffs. *See, e.g., King v. Baldino*, 648 F. Supp. 2d 609, 611 n.4 (D. Del. 2009) (considering contents of WALL STREET JOURNAL articles referenced in plaintiff's complaint); *Benak v. Alliance Capital Mgmt. L.P.*, 349 F. Supp. 2d 882, 889 (D.N.J. 2004) (same); *In re Loewen Group Inc. Secs. Litig.*, Civ. A. No. 98-6740, 2004 WL 1853137 at *6 (E.D. Pa. Aug. 18, 2004) (same); *In re Lucent Techs., Inc. Sec. Litig.*, 217 F. Supp. 2d 529 (D.N.J. 2002) (same).

In any case, the cited WALL STREET JOURNAL articles merely corroborate SEPTA's own statistical analysis of its FX trading (¶ 46) and the allegations made by the Florida and Virginia Attorneys General (¶¶ 28, 40-42). As the *Hill* court reasoned, "Plaintiffs' evidentiary sources strengthen one another and collectively paint a plausible picture of a company defrauding its [custodial] clients [conducting indirect FX trading with the defendant-custodial bank]. Multiple

types of evidence from multiple sources reinforce the same narrative." 2011 WL 3420439, at *13. The same is true here.

IV.     **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' motion to dismiss in its entirety. To the extent the Court grants the motion in whole or in part, Plaintiff respectfully requests leave to amend pursuant to FED. R. CIV. P. 15(a).

Dated: August 17, 2011                    Respectfully submitted,

                                          **KESSLER TOPAZ MELTZER
                                             & CHECK, LLP**

                                          */s/ Joseph H. Meltzer*
                                          Joseph H. Meltzer
                                          Matthew Mustokoff
                                          Peter H. LeVan, Jr.
                                          Naumon A. Amjed
                                          280 King of Prussia Road
                                          Radnor, PA  19087
                                          Tel:  (610) 667-7706
                                          Fax:  (610) 667-7056

                                          **NIX PATTERSON & ROACH, LLP**
                                          Bradley E. Beckworth
                                          Brad E. Seidel
                                          Susan Whatley
                                          205 Linda Drive
                                          Daingerfield, TX  75638
                                          Tel:  (903) 645-7333
                                          Fax:  (903) 645-4415

                                              and

                                          Jeffrey J. Angelovich
                                          3600 N. Capital of Texas Hwy., Bldg. B
                                          Suite 350
                                          Austin, TX  78746
                                          Tel: (512) 328-5333
                                          Fax: (512) 328-5335

                                          *Counsel for Plaintiff Southeastern Pennsylvania
                                          Transportation Authority and Interim Co-Counsel
                                          for the Class*